# UNITED STATES COURT OF APPEALS
## FIFTH CIRCUIT

_____

No. 99-50054

_____

TRACY PARKER STREBER; ET AL,

Plaintiffs,

TERRY PARKER DAVIS DELONY,

Plaintiff-Appellee-Cross-Appellant,

versus

EDWIN K. HUNTER; ET AL,

Defendants,

EDWIN K. HUNTER; EDWIN K. HUNTER, A PROFESSIONAL LAW CORPORATION; T. GLYNN BLAZIER; TIMOTHY O'DOWD,

Defendants-Appellants-Cross-Appellees.

Appeals from the United States District Court
for the Western District of Texas

August 4, 2000

Before REYNALDO G. GARZA, JONES, and EMILIO M. GARZA, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

Edwin K. Hunter, T. Glynn Blazier, Timothy O'Dowd, and Edwin K. Hunter, P.C. ("the firm") (collectively "the attorneys"), appeal from a jury verdict holding them liable for legal malpractice, breach of fiduciary duties, and violations of the Deceptive Trade Practices Act ("DTPA"), TEX. BUS. & COM. CODE ANN. § 17.41 *et seq*. We affirm in part and reverse in part.

**I.**

In 1979, Larry Parker ("Parker"), a self-made entrepreneur, businessman, and land developer, discovered o ver four hundred acres of undeveloped land in a potentially lucrative residential area outside of Houston.[1] Parker, however, lacked the funds to purchase the land, so he recruited a friend, California attorney Robert Bradish. Bradish came to Texas and took title to the land for himself, forming a joint venture with Jack Thoner. Parker never owned any of the land, or any of the equity interest in the joint venture. As part of the joint venture agreement, for Parker's substantial work bringing the deal together: (1) he would receive $2.5 million from the venture's initial profits, and (2) a large portion of the equity interest in the venture was placed in trust for Parker's daughters, Terry and Tracy (collectively "the sisters"),[2] with Bradish as the trustee. Parker envisioned the gift as an early inheritance of sorts, a "nest egg" for Terry and Tracy.[3]

---

[1] The land, subsequently called the Northgate Forrest subdivision, is North of Houston, off of FM ("Farm-to-Market") 1960, adjacent to Champions Golf Course.

[2] During the period at issue in this case, Terry had three surnames, Parker (her father's name), Davis (from her marriage to Steve Davis), and Delony (from her marriage to Dale Delony). Tracy had two, Parker and Streber (from her marriage to Paul Streber). They will be referred throughout the opinion as "Terry" and "Tracy," respectfully.

[3] Bradish testified that Parker gave the interest to his daughters as part of a promise Parker had made to his wife, Betty, to take care of the girls. Bradish testified that once the deal went through Parker had no ability to take the venture interest, or later the notes, from Terry or Tracy.

In 1981, Bradish sold the property, and Terry and Tracy each received a promissory note, payable in 1985 in the amount of $2 million. Bradish endorsed the notes to Terry and delivered them to her sometime in 1982, when Terry was nineteen years old and Tracy fourteen. Contemporaneously, Terry signed a "management agreement" which purported to place control over the money in Parker's hands until each of the girls reached the age of twenty-five. Tracy then placed the notes and the "management agreement" in her safety deposit box. After the notes became due in 1985, the sisters each received $1.7 million and a lot in the Northgate Forest subdivision.[4] At the time they received these large sums of money, Tracy was approximately twenty years old, and Terry was six months short of her twenty-fifth birthday.

When Terry and Tracy received the money from the promissory notes, they promptly deposited it in their own checking accounts and contemplated how to safely invest their "nest egg." The next day, however, Parker approached them and asked them to invest the money in one of his companies, Bowman Development D/B/A Sovereign Energy ("Sovereign Energy"), in which they were minority stockholders. Terry and Tracy both refused, telling their father that they wanted to invest the money in certificates of deposit and other safe investments. Parker became infuriated, fired Terry (who, at the time, was working for him), and ceased communication with his daughters. The

A letter written from Bradish to Betty, in Parker's presence, stated that Bradish held the interests "in trust" for Terry and Tracy and that Parker would become the trustee if Bradish died. However, the document clearly shows that Terry and Tracy owned the interest in 1980, and Parker had no control over it at any time thereafter.

[4] The payor on the notes failed to pay when they were due, so Parker (whose claim to $2.5 million from the venture's initial profits had been converted into promissory notes in the sale of the venture interest), Terry, Tracy, and the other stakeholders filed suit against the payor. The $1.7 million and lot in the subdivision that Terry and Tracy each received came from a settlement of that lawsuit. Terry signed the settlement agreement as "owner" and "holder" of the notes.

record reflects that the family rift was never mended.[5]

After Terry and Tracy each received their $1.7 million, but before the family squabble, Parker had told Terry to make sure she paid the capital gains taxes on the income. Since Parker had cut off communication with Terry and Tracy, and neither had ever filed a tax return before, they asked their stepfather, Lee Berwick,[6] if he knew of someone who could help them with their taxes. Berwick directed them to Edwin Hunter, a Lake Charles, Louisiana tax specialist who had done work for Berwick in the past.

With Berwick's recommendation, Terry and Tracy drove to Lake Charles and met with Hunter.[7] After briefly examining a few documents which Tracy and Terry gave him, but before doing any legal research,[8] Hunter presented the sisters with three options: (1) pay no taxes and hope the IRS did not find out about the transaction within the ten year statute of limitations, (2) treat the

---

[5]    Parker died before the present suit went to trial.

[6]    In 1982, Parker and Betty Parker ("Betty"), Terry and Tracy's mother, divorced. Betty married Lee Berwick shortly thereafter.

[7]    The attorneys argue that the sisters sought out legal assistance not to determine how much tax to pay on the notes, but rather to hide the money from Parker. This argument belies the evidence, which overwhelmingly supports Terry's claim that they sought out legal assistance on how to treat the $1.7 million for tax purposes. Terry, Tracy, Steve Davis (Terry's ex-husband), and Lee and Betty Berwick, all of whom were present at the meeting, testified that they went to see Hunter because they believed they owed tax on the $1.7 million. This outweighs the evidence to the contrary, which includes the testimony of Hunter and Reed Mendelson, who was not present at the meeting.

[8]    The key question in determining who owed tax on the $1.7 million was who owned the notes in 1985 and, as the Tax Court found, "[w]e examine Texas law to determine who owned the $2 million notes when they were paid." *Streber v. Commissioner*, 70 T.C.M. (CCH) 1604, 1608, 1995 WL 754033 (T.C. 1995). At that time, Hunter was not a member of the Texas bar, and despite the fact that "[s]tate law controls," *id.* he did no legal research before rendering his opinion to Terry and Tracy.

transaction as a 1981 gift and pay capital gains taxes on the income received in 1985, or (3) treat the transaction as a 1985 gift, in which case Parker would be liable for gift tax and they would be liable for nothing. Despite scoffing at the "management agreement" as unenforceable and calling it "not a legal document,"[9] Hunter told Terry and Tracy that Parker had not given up control over the money until 1985, and that, accordingly, the gift did not occur until then.

While the sisters were somewhat wary of paying nothing to the IRS after receiving $1.7 million, Hunter told them that if they paid capital gains taxes on the money, the IRS might suspect they were "in cahoots" with their father to pay the lower capital gains tax as opposed to the higher gift tax. Hunter expressed to the sisters both his fervent belief that Parker owed the gift tax and the threat that paying capital gains taxes could place them at risk of IRS prosecution.[10] When the sisters finally agreed to treat the transaction as a 1985 gift on which Parker owed gift tax, Hunter "affirmatively advise[d] and vigorously assist[ed] [in their] chosen course of action." *Streber v. Commissioner*, 138 F.3d 216, 221 (5th Cir. 1998).

Hunter and his firm subsequently became involved in several other lawsuits revolving around this less-than-amicable family. Specifically, Parker, described as a "highly litigious individual," filed several lawsuits against the sisters and the Berwicks. After Terry and Tracy refused to invest their

---

[9] Hunter disputes that he ever believed the "management agreement" was unenforceable, but several witnesses testified that, during their initial meeting, Hunter had expressly told them that this was true as a matter of law. Those witnesses included Steve Davis, Betty Berwick, Terry, and Tracy. Further, in a letter sent by Hunter's associate, C. Eston Singletary, to Parker's attorney, David Gamble, on June 17, 1985, Hunter's firm stated that "we continue to believe that the document on which Mr. Parker's assertion [to control the sisters' funds] is based is null and void and has no effect."

[10] Hunter did not tell Terry and Tracy that they could pay the capital gains tax conditionally, and sue for a refund, which would establish who owed the tax and, more importantly, would stop the accrual of interest pending resolution of the issue.

money in Sovereign Energy, Parker sued them to recover the stock interest that he had given to them. Terry and Tracy were content to give the Sovereign Energy stock back to their father, but Hunter, who represented the sisters in the lawsuit, told them not to do so. Instead, Hunter recommended that they hold the stock as leverage against Parker to persuade him to pay the gift tax. Terry and Tracy, relying on Hunter's advice, agreed. Parker also threatened to file suit to enforce the "management agreement," and if he filed such a suit (the record conflicts on whether such the suit was filed), Hunter would have represented Terry and Tracy.

Hunter was also advising Betty Berwick in connection with an "alienation of affections" suit that Parker brought against her and her husband. After investigating Parker's assets, Hunter told Betty that Parker had hid substantial assets from her during their divorce and encouraged Betty to file suit against Parker for hiding those assets. The documents and testimony at trial shows that Hunter's planned lawsuit against Parker could have potentially brought a recovery for Betty of $17 million, and, under their contingent fee agreement, if Betty won the lawsuit, Hunter could have received approximately $3 million.[11] Hunter believed Betty's lawsuit against Parker to be very important for his firm.[12]

In 1986, Parker's attorney, David Gamble, wrote a letter to Hunter expressing his belief that the sisters' position))that Parker had made a gift to Terry and Tracy in 1985))was belied by the documents surrounding the land deal. Gamble claimed that the documents were exceptionally clear

---

[11]     Hunter encouraged Betty to file this lawsuit, but Betty refused to do so.

[12]     At the time Hunter gave Terry and Tracy his original advice, Hunter worked for the firm of Camp, Carmouche, Barsh, Hunter, Gray, Hoffman & Gill. In 1987, Hunter left Camp, Carmouche, and formed Hunter & Boland, and later left that firm to form Hunter, Blazier, O'Dowd & Moreno. Terry and Tracy remained clients of Camp, Carmouche for a brief time after Hunter left, but for all practical purposes "followed" Hunter throughout his travails.

-6-

that, by the terms of the 1980 land deal, Terry and Tracy became owners of a joint venture interest immediately, not subject to Parker's control at all. Gamble specifically offered to send Hunter the documents underlying the land deal, some of which Hunter had never before read, in an effort to prove his point.[13] Hunter, however, refused to follow up on Gamble's offer, instead relying on his original advice; as he testified at trial, he "understood the land deal" and did not need to investigate further. Gamble also proposed so-called "global peace talks" to resolve all the conflicts between Parker and his daughters, which Hunter refused without first consulting with Terry and Tracy.

In October 1991, the IRS issued notices of deficiency against both the sisters and Parker "in order to avoid a 'whipsaw' situation," *Streber*, 138 F.3d at 218, and the cases were consolidated for trial in the Tax Court. Hunter, Blazier, and O'Dowd represented the sisters in discovery and at the tax trial. In 1992, Hunter put O'Dowd on the case, and he began (for the first time) to do legal research into what constituted a "gift" under Texas law[14] and factual research into the particulars of

---

[13]     The letter provided, *inter alia*,

There is no question that your clients acquired an interest in a joint venture in 1980. That interest was subsequently sold in return for notes which were paid in 1985. Under no circumstances can it be construed that your clients received any kind of a gift from their father in 1985. I encourage you to re-evaluate the reporting of your clients receipt of the proceeds of the notes. We will provide you with any background information that you might need; but other clients of yours, the Berwicks, have been aware since 1980 of the circumstances under which Teresa and Tracy acquired their original interests in the joint venture. I do not need to tell you how severe the consequences can be for the failure to report capital gains income in the year in which it was realized. Please call me if you have any questions.

[14]     As O'Dowd testified, when he took over the case, neither he nor the firm even knew what law applied in considering whether and when a gift had been made for tax purposes.

the land deal.[15] O'Dowd (1) sent out an memorandum to a colleague, Mitch Vervoort, asking for help with the legal research,[16] (2) requested more documentation of the land deal, (3) called and later deposed Bradish (who had never been contacted by any lawyer on the sisters' case before), and (4) kept in contact with Parker's attorneys.

In 1993, there was a mediation between the sisters, Parker, and the IRS. Representing Terry and Tracy at the mediation were O'Dowd, Blazier, and Houston attorney Diana Marshall. As the district court found, "[t]here was credible evidence at trial that the IRS would have settled [during the mediation] for between [$1 and $1.2 million]."[17] The mediator, a former judge, and Parker's

---

[15] As O'Dowd testified, when he took over the case, the firm did not have possession of many of the key documents, and he had to retrieve them from the key parties to the land deal. His research revealed, *inter alia*, the settlement agreement from the 1985 lawsuit on the notes, which identified Terry as the note's owner, and a letter, written in 1980 by Bradish to Betty, stating:

Dear Betty Parker,

This is to confirm that J. Robert Bradish holds in trust for Tracy Parker and Terry Parker 80% of the 50% venture interests (i.e. 40% of the venture) which is being negotiated between Jack Thoner and J. Robert Bradish. In the event J. Robert Bradish dies prior to termination of the venture, the trustee will be Larry Parker or a person chosen by him.

Prior to that time, neither Hunter nor anyone involved with the sisters' case had seen the letter.

[16] The memorandum began "I have an emergency request." After listing some of the facts of this case, it asked, "Is this a Texas trust? Is it valid? Is it revocable? Remember this was done in 1980. Is this some other relationship?" Vervoort's response memo concluded that it was unlikely a trust was created, and that the sisters controlled the assets at least since the notes were endorsed and delivered in 1982.

[17] The attorneys argue strenuously that there was no evidence that the IRS would have settled at the 1993 mediation. However, the record shows that the jury was presented with substantial evidence from which they could have found this fact to be true: O'Dowd specifically testified that he believed (despite the lack of a formal offer) the IRS would have settled for $1.2 million, a letter allegedly signed by O'Dowd posited that Terry and Tracy could have settled for $1 million, and Diana Marshall testified that the $1.2 million dollar offer appeared to be on the table.

attorney, Bob White, both told Terry and Tracy that they would probably lose the tax trial. Further,

both opined that even if the sisters "won" the case by proving that Parker owed the gift tax, they

would still "lose" because they would probably be liable for the higher gift tax *via* transferee liability.[18]

Yet, confident that they would win the case, and dubious about the prospect of transferee liability,

Blazier and O'Dowd insisted that they would win.[19] Based on that advice, the sisters did not settle.[20]

---

Both Terry and Tracy testified that their understanding was that a settlement at that price was offered, and that they could have afforded to settle at that price, but chose not to do so because settlement was not recommended. The record also shows that settlement at this price was available from the mediation until the Tax Court rendered its decision in December, 1995. The attorneys also argue, in contradictory fashion, that they counseled Terry and Tracy to settle, but that they refused to because Parker would not contribute to the settlement. Since there was conflicting testimony on this issue, and we must believe the evidence presented by Terry, *see Reeves v. Sanderson Plumbing Products Inc.*, –S.Ct.–, 2000 WL 743663, at *10 (U.S. June 12, 2000), we assume that Terry would have settled for between $500,000 and $600,000 (her half of the $1-$1.2 million), but did not based on the advice of Hunter, Blazier, and O'Dowd.

[18]     "Transferee liability" allows the government to collect gift tax from either the donor or the donee. *See* 26 U.S.C. § 6901 (allowing the IRS to seek gift tax liability from either the donor, Parker, or the donees, Terry and Tracy); *see also Tilton v. Commissioner*, 88 T.C. 590, 594 (T.C. 1987) ("[S]ection 6901(a)(1)(A) authorizes the assessment of transferee liability, at law or in equity, in the same manner as the liability for gift taxes. This provision, however, does not create any separate liability; it merely provides a secondary method for enforcing the existing liability of a transferor.").

[19]     O'Dowd and Blazier argue, in their individual briefs, that they advised Terry and Tracy to settle because of the substantial risk of loss at trial. However, the evidence in the record is overwhelming as to the attorney's certainty that their position would be vindicated at the tax trial)) they claimed that the "documents would speak for themselves" and that the only risk was that the equities weighed against two daughters who received a gift and sought to force their father to pay taxes on the gift. Blazier and O'Dowd were unquestioning in their devotion to Hunter's original advice. As Diana Marshall testified, "You would have thought listening to the three of them that Edwin Hunter was God."

[20]     In a letter to O'Dowd shortly after the mediation, Gary Cornwell, one of Parker's lawyers, notified O'Dowd of Cornwell's belief that Hunter and O'Dowd could no longer be objective and, accordingly, that outside counsel should be called in to counsel Terry and Tracy on settlement. As Cornwell claimed, "Given the fact that Mr. Hunter of your firm is a principal cause)) if not the principle cause)) of both the present litigation, and the enormous tax liabilities that have accrued and

The Tax Court ruled that the sisters were liable for the tax and accrued interest and also imposed negligence and substantial underestimation penalties. *See Streber v. Commissioner*, 70 T.C.M. (CCH) 1604, 1609, 1995 WL 754033 (T.C. 1995). In deciding that Parker intended to make a gift to his daughters in 1980, the Court relied largely on the documents and on Bradish's testimony that Parker wanted the daughters to have an interest in the project "from the beginning" and wanted Terry and Tracy's interests "protected from him, so that he couldn't get his hands on the money." *Id.* Finding that the notes had been delivered to and accepted by Terry, the Court found it clear that "the daughters are taxable on the proceeds of the $2 million notes and that Parker is not." *Id.*

Shortly after the Tax Court's ruling, an IRS agent telephoned Terry, demanded an immediate meeting at her home, and began to catalogue the value of her home and other assets. Terry feared that the IRS would immediately seize her home and other assets. When she asked her attorneys if the IRS would act immediately, the attorneys responded "they might." Terry visited the office of Conde Cox, an Austin bankruptcy attorney, who after investigating her cause advised her to file for bankruptcy. After reviewing the transaction resulting in such huge interest payments, Cox also advised Terry to seek out a consumer lawyer to investigate the conduct of her attorneys.

Simultaneously, Terry had to decide whether to appeal the decision of the Tax Court. After consultation with Cox and a tax expert, Mike Cook, Terry and Tracy decided not to appeal the underlying decision that they owed capital gains tax for a gift made in 1980,[21] but to appeal the Tax

now are being pursued by the IRS against both your clients and mine, we believe that settlement negotiations cannot be effectively pursued except through an independent law firm." It is unclear whether this issue was ever resolved, but it is clear that the concern was never disclosed to Terry and Tracy.

[21]    Terry and Tracy, through counsel, offered Hunter, Blazier, and O'Dowd an opportunity to appeal the substantive tax finding on their own, but, through counsel, the attorneys

Court's imposition of "negligence" and "substantial underestimation" penalties. Cook felt that appealing the underlying tax would be worthless, as under our "clearly erroneous" standard of review reversal of the Tax Court's factual finding that the gift had occurred in 1980 would be almost impossible. He felt, however, that the Tax Court had erred in its imposition of the penalties, and that they would be able to convince this court to reverse on those issues. Cook opined that appealing both the tax and the penalties would make this court less likely to reverse the penalties, as "it would take away from the focus on what we thought was a very good case, and that is the penalty appeal."[22] This strategy worked, insofar as without disturbing the underlying tax finding, we reversed the penalties. *See Streber*, 138 F.3d at 219.

After being advised by several attorneys that they had been disserved by their counsel, Terry and Tracy filed suit under Texas tort law and the DTPA against many of their lawyers, including Hunter, O'Dowd, and Blazier. The sisters argued that the attorneys had (1) failed to conduct a thorough factual investigation, (2) failed to do adequate research in Texas law, (3) incorrectly advised the sisters on potential transferee liability should Parker be held liable for the gift tax, (4) failed to disclose material facts the lawyers knew about the law, (5) advised the sisters not to settle in 1993 even though they knew their position was wrong, and (6) used the sisters' case as leverage in another case they had against Parker.

_____

declined the opportunity, stating that they had no desire to "help [Terry and Tracy] mitigate damages."

[22]     Cook testified that appealing the imposition of the substantive tax finding "would have affected our credibility on the entire appeal. And it was our fear that the appeals court would look at what I think would have been next to a frivolous appeal and decided that)) and would have paid very little attention to our penalty argument and would have simply affirmed the Tax Court on all of its holdings."

After a continuance was granted during which this court ruled on the penalties issue, the case against Hunter, Blazier, and O'Dowd went to trial. The attorneys decided on a joint defense.[23] After a two-week trial, which included competing experts and testimony from all three defendants and both sisters, a jury found for Terry and Tracy on all substantive counts (negligence, breach of fiduciary duties, and violations of the DTPA) and awarded actual damages totaling $2,172,788. The largest portion of these damages represented the difference between the amount of money the sisters would have paid the IRS had the attorneys advised them correctly and the amount they eventually had to pay. This difference was represented by the "interest differential," i.e. the difference between the interest the sisters actually earned while they possessed the $1.7 million each and the interest charged by the IRS for such possession. Actual damages also encompassed compensation for the time Terry and Tracy had spent trying to rectify the harm the attorneys had caused. The jury apportioned liability for these compensatory damages at 60% for Hunter, 20% for Blazier, 10% for O'Dowd, and 10% for the firm. The jury also, finding that their DTPA violations were committed "knowingly," imposed DTPA additional damages on each defendant, a total of $6 million against Hunter, $2 million against Blazier, $200,000 against O'Dowd, and $8.2 million against the firm.

Terry moved for the entry of judgment, and the attorneys moved for judgment as a matter of law. The district court entered judgment for Terry. In doing so, after reviewing the jury verdict and the evidence presented in the case, it noted that the "failure to settle forms the basis of the sisters' damages in this case, as they assert that had they not been misled about the merits of their case, they would have settled in 1993 and avoided the increasingly adverse series of events occurring after that

---

[23]     Separate counsel has been retained to represent Blazier and O'Dowd on appeal. A member of this court granted the attorneys' motions to each file separate briefs, and they have done so.

time." Finding that there was sufficient evidence to support the jury's finding on liability, the trial court entered judgment for Terry.[24] However, the court excluded the award of attorneys fees for work done prior to the 1993 mediation; the court held that since Terry and Tracy's damages flowed from the failure to settle, these damages were not recoverable.

The district court also reformed the jury's award of additional damages. Since DTPA additional damages can only be a total of twice the amount of actual damages awarded for a DTPA violation, *see* TEX. BUS. & COM. CODE § 17.50(b)(1), and the jury's award of additional damages far exceeded twice the amount of actual damages, the court could not enter judgment in the amount awarded by the jury. To recalculate, the court doubled the amount of actual damages (awarded for all three substantive counts) to calculate a total additional damage award, and divided that amount in proportion to the jury's finding of liability for additional damages as to each defendant. Accordingly, Hunter was held liable for 36.6% of the additional damages, O'Dowd for 1.2%, Blazier for 12.2%, and the firm for 50% of the additional damages.

Hunter, Blazier, O'Dowd, and the firm appealed.

## II.

We first consider Blazier's claims that the district court lacked personal jurisdiction over him and that, if personal jurisdiction existed, Louisiana law should have applied. Because Blazier is a Louisiana resident whose contacts with Texas were not continuous, the Constitution permits personal jurisdiction over Blazier in Texas only if he "purposefully availed" himself of the benefits and protections of Texas law by establishing "minimum contacts" with Texas and if the exercise of

---

[24] Shortly before judgment on the verdict was rendered, Tracy settled her dispute with the attorneys. Therefore, the judgment was rendered only for Terry, and her case is the only one remaining on appeal.

jurisdiction over Blazier does not offend "traditional notions of fair play and substantial justice." *See Access Telecom, Inc. v. MCI Telecommunications Corp.*, 197 F.3d 694, 716 (5th Cir. 1999) (calling this "specific" jurisdiction) (citing *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S. Ct. 154, 160, 90 L. Ed. 95, __ (1945) and *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 113, 107 S. Ct. 1026, 1034, 94 L. Ed. 2d 92, __ (1987)).

We find that the Texas district court had jurisdiction over Blazier. Blazier "purposefully availed" himself of Texas laws when he gave tax advice that he knew would be received by a Texas client, *see Busch v. Buchman, Buchman & O'Brien*, 11 F.3d 1255, 1257 (5th Cir. 1994) (allowing Texas personal jurisdiction over New York attorney who only performed work in New York because he knew his tax opinion would be included in materials shipped to Texas), and thus he had "minimum contacts" with the forum state. Second, since at least some of the allegations forming the basis of this lawsuit arise out of Blazier's contacts with Texas)) much of Blazier's alleged malpractice occurred during the 1993 mediation, which took place in Houston)) the exercise of personal jurisdiction over Blazier comported with traditional notions of fair play and substantial justice.[25] Accordingly, the district court did not err in asserting personal jurisdiction over Blazier. *Cf. Trinity Industries v. Myers & Associates*, 41 F.3d 229, 230 (5th Cir. 1995) (allowing jurisdiction over Illinois

---

[25] Terry's allegations of Blazier's failure to disclose material information from Louisiana to her in Texas also forms a basis for personal jurisdiction. "[W]hen a lawyer chooses to represent a client in another forum, that in itself does not confer personal jurisdiction if the claim does not arise from the lawyer's contacts with the forum. However, when the claim arises from a breach of fiduciary duty based on a failure to disclose material information, the fact that the lawyer continually communicated with the forum while steadfastly failing to disclose material information shows the purposeful direction of material omissions to the forum state." *Wein Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 213 (5th Cir. 1999)

lawyer who represented Texas company for eight years and occasionally came to Texas).[26]

Blazier also argues that Louisiana law, specifically the Louisiana statute of limitations, which he argues would have barred the suit, should have applied to Terry's claims against him. The district court considered this claim thoroughly in a published opinion, *see Streber v. Hunter*, 14 F. Supp. 2d 978, 984-84 (W.D. Tex. 1998), and we agree with its fine analysis. Federal courts apply the choice-of-law rules of the forum state, *see Klaxon Co. v. Stentor Elec. Manu. Co.*, 313 U.S. 487, 496, 61 S. Ct. 1020, 1021-22, 85 L. Ed. 1477, __ (1941), and thus here we apply Texas's "most significant relationship" test. We examine the following factors:

(1) the needs of the interstate and international systems;
(2) the relevant policies of the forum;
(3) the relevant policies of other interested states and the relative interests of those states;
(4) the protection of justified expectations;
(5) the basic policies underlying the particular field of law;
(6) certainty, predictability and uniformity of result;
(7) ease in the determination and application of the law to be applied.

*See Askanse v. Fatjo*, 130 F.3d 657, 671 & n.9 (5th Cir. 1997) (citing RESTATEMENT (SECOND) OF CONFLICT OF LAWS, §§ 6, 143 (1971)). In doing so, we are guided by the following factual inquiries:

(1) The place where the injury occurred;
(2) The place where the conduct causing the injury occurred;

---

[26] Blazier also argues that the district court lacked jurisdiction over him because his tax advice concerned federal tax law rather than issues of Texas law. We disagree. As a threshold matter, as described in the Tax Court opinion, the tax advice given in this case was (or, at least, should have been) based, in large part, upon the Texas law of gifts. *See Streber*, 70 T.C.M. at 1608. Further, the distinction alleged by Blazier would make little sense as a practical matter. For example, if a Louisiana attorney committed malpractice while advising a Texas client in a Title VII case, a Rule 10(b)(5) securities law case, or, for that matter, a case involving interpretation of the United States Constitution, the Texas courts could still have personal jurisdiction over that attorney if (1) his contacts with Texas satisfied the "minimum contacts" requirement, and (2) the exercise of jurisdiction did not offend traditional notions of fair play and substantial justice. The fact that these issues all involve federal, rather than Texas, law is of no moment.

(3) The domicile, residence, nationality, place of incorporation of the business of the parties;

(4) The place where the parties' relationship is centered;

*See id.*

Blazier desires the protection of the Louisiana statute of limitation on legal malpractice claims, which contains an extremely limited discovery rule.[27] The critical factor for the district court in its decision to apply Texas law was the Texas courts' vigilance in protecting its citizens by allowing a discovery rule on the limitations period for malpractice claims; the Court held that the contrary Louisiana policy "directly contradicts Texas precedent protecting the rights of Texas clients and arguably violated the Open Courts provisions [of the Texas and Louisiana constitutions] by divesting an individual of a cause of action before he or she had reason to know it existed." *Streber*, 14 F. Supp. 2d at 984. Further, "it was foreseeable [to the attorneys] when the representation began that litigation could likely ensue in Texas, especially considering that litigation was already occurring in Houston." *Id.* Accordingly, balancing the attorneys' and Louisiana's interests with those of Texas and the sisters, the court held that Texas law applied.

While "[a]mong the fundamental purposes underlying a state's statute of limitations is the protection of the resident defendants of that state," *Industrial Indemnity Co. v. Chapman and Cutler*,

---

[27]    The Louisiana statute of limitations for legal malpractice cases provides that such suits must be brought within one year of the date that the malpractice occurred or it discovers, but limits the potential tolling offered by the discovery rule to two years. *See* La. Rev. Stat. Ann. 9:5605A ("[E]ven as to actions filed within one year from the date of discovery, in all events such actions shall be filed at the latest within three years from the date of the alleged act."); *Reeder v. North*, 701 So. 2d 1291, 1296 (La. 1997) ("The Legislature was aware of the pitfalls in this statute but decided, within its prerogative, to put a three-year absolute limit on a person's right to sue for legal malpractice, just as it would be within its prerogative not to allow legal malpractice actions at all."). Since the attorneys' alleged malpractice extended over a long time, depending on when a court would determine the actual "acts" constituting malpractice occurred, the suit may have been barred under Louisiana law.

22 F.3d 1346, 1351 (5th Cir. 1994), Texas has an "interest in allowing its residents to recover for injuries sustained in a state that would recognize their claim as timely." *Id.* at 1351 n.9. In Texas, attorney malpractice claims are among the two types of claims that, because they are considered "inherently undiscoverable," implicate an unlimited discovery rule. *See S.V. v. R.V.*, 933 S.W. 2d 1, 8 (Tex. 1996). The rationale underlying the discovery rule in such cases is that the attorney-client relationship presupposes a fiduciary duty between attorney and client, who is "either unable to inquire into the fiduciary's actions or unaware of the need to do so." *Id.* While Texas law recognizes the burdens upon attorneys caused by the discovery rule, the Texas Supreme Court has made clear that "any burden placed upon an attorney by application of the discovery rule is less onerous than the injustice of denying relief to unknowing victims." *Willis v. Maverick*, 760 S.W. 2d 642, 646 (Tex. 1988). Texas's policy of protecting its citizens against the "inherently undiscoverable" malpractice of attorneys is well-established.

The facts guiding our inquiry, furthermore, are at best equivocal, and viewed in the light most favorable to Terry, are supportive of the district court. The "injury" occurred in Texas, and the conduct causing the injury occurred both in Texas (during the mediation) and in Louisiana (before and after the mediation). The attorneys are all residents and licenced practitioners in Louisiana, and Terry is a resident of Texas. We believe that the district correctly determined that "[t]he relationship cannot be said to be 'centered' either exclusively in Louisiana and Texas, since numerous contacts occurred in both states and both states have significant connections to the litigation." *Streber*, 14 F. Supp. 2d at 984. Given that the facts in this case weigh in favor of the application of Texas law, and that the Texas policy "is as strong if not stronger," *id.* at 983, than that of Louisiana, Texas law was properly applied by the district court.

-17-

### III.

Most of the attorneys' remaining claims on appeal focus on the sufficiency of the evidence presented by Terry to find liability, causation, and damages for each of the alleged torts and for the DTPA violation. Accordingly, the standard of review over these claims is a critical issue. Terry argues that since the defendants did not move for a directed verdict at the close of all the evidence as required by FED. R. CIV. P. 50(b), the standard of review should be "plain error" and we should affirm if there is "any evidence" to support the verdict. *See Polanco v. City of Austin*, 78 F.3d 968, 973-74 (5th Cir. 1996) ("The absence of a motion challenging the evidence prior to submission to the jury precludes the appellate court from evaluating and weighing the evidence to test its sufficiency."). While the attorneys do not dispute their failure to technically comply with Rule 50(b), they assert that their actions)) moving for judgment as a matter of law at the end of the plaintiff's case in chief and objecting to the jury charge on the same grounds)) satisfy the "purposes" of Rule 50(b) and that, therefore, they have not waived the more favorable "sufficiency of the evidence" standard of review. *See Bay Colony v. Trendmaker, Inc.*, 121 F.3d 998, 1002 (5th Cir. 1998) ("[T]his Court has not required strict compliance with Rule 50(b) and has excused technical noncompliance where the purposes of the requirements have been satisfied.").

On this issue, we agree with the attorneys. At the end of the plaintiffs' case in chief, the attorneys moved for judgment as a matter of law, which was denied. At the close of all of the evidence, the parties participated in a four-hour conference to discuss the jury charge. After the conference, but before closing arguments, the attorneys and the trial judge engaged in a colloquy about the timing of the remainder of the trial. The judge stated that while in light of the plethora of objections raised at the charge conference he had "no intention of waiving . . . anything procedurally,"

he would submit the charge to the jury and hear objections, on the record, while the jury was deliberating.[28] While the jury was deliberating, the attorneys made objections, on the record, to the jury charge. During those arguments, the attorneys challenged the sufficiency of the evidence on all of the issues they bring up on appeal.

"This Court has repeatedly emphasized that the application of Rule 50(b) should be examined in the light of the accomplishment of its particular purposes as well as in the general context of securing a fair trial for all concerned in the quest for truth." *Bay Colony*, 121 F.3d at 1003. We apply the Rule "with a liberal spirit," *see Alcatel USA, Inc. v. DCI Technologies, Inc.*, 166 F.3d 772, 781 (5th Cir. 1999), and excuse technical noncompliance with the Rule "where the purposes of the rule are satisfied." *Polanco*, 78 F.3d at 974.

Rule 50(b) "serves two basic purposes: to enable the trial court to re-examine the sufficiency of the evidence as a matter of law if, after the verdict, the court must address a motion for judgment as a matter of law, and to alert the opposing party to the insufficiency of his case before being submitted to the jury." *Polanco*, 78 F.3d at 974. Here, the attorneys moved for summary judgment before trial, moved for judgment as a matter of law after the plaintiffs' case, and objected to the jury charge, all on the identical grounds on which they appeal. Both the plaintiffs and the district court were clearly aware of the defendant's arguments before the case was submitted to the jury and, accordingly, the purposes of Rule 50(b) were satisfied. *See Greenwood v. Societe Francaise De*, 111

---

[28]     The trial judge stated that because he "was appraised of the large number of arguments that everyone had with regard to the inclusion and exclusion of items from the charge prior to the reading . . . for purposes of time and to make sure that the parties were not deprived of any of their ability to take up on appeal any inclusions or exclusions out of the charge . . . [he would] give them an opportunity [after the charge was read] to just state into the record what the)) what their arguments were for both inclusion or exclusion of items."

F.3d 1239, 1244 (5th Cir. 1997) ("These purposes [of Rule 50(b)] are met when the court and the plaintiff are alerted to the grounds on which the defendant contends the evidence is insufficient prior to the submission of the case to the jury.").

However, while we agree that the attorneys have not waived the "more favorable" standard of review, we nevertheless "employ a deferential standard of review when examining a jury's verdict for sufficiency of the evidence." *Douglas v. DYNMcDermott Petroleum Operations Co.*, 144 F.3d 364, 369 (5th Cir. 1998). We review the evidence in its strongest light in favor of Terry, giving her "the advantage of every fair and reasonable inference which the evidence justifies." *Bartley v. Euclid, Inc.*, 180 F.3d 175, 179 (5th Cir. 1999) (en banc); *see also Reeves*, 2000 WL 743663, at *11. On each issue, "[w]e will not disturb the jury's verdict unless, considering the evidence in the light most favorable to [Terry], the facts and inferences point so overwhelmingly to [the attorneys] that reasonable jurors could not have arrived at a verdict except in [their] favor." *Douglas*, 144 F.3d at 369; *see also FDIC v. Mmahat*, 907 F.2d 546, 552 (5th Cir. 1990) (applying this standard of review to a legal malpractice claim). With this in mind, we proceed to the attorneys' substantive claims.

## IV.

In Texas, a legal malpractice claim sounds in tort and is evaluated based on negligence principles. A plaintiff must prove four elements to recover: (1) the defendant owed a duty to the plaintiff; (2) the defendant breached that duty; (3) the breach proximately caused the plaintiff injury; and (4) damages resulted. *See SMWNPF Holdings v. Devore*, 165 F.3d 360, 364 (5th Cir. 1999) (citing *Cosgrove v. Grimes*, 774 S.W. 2d 662, 664-65 (Tex. 1989)); *Simpson v. James*, 903 F.2d 372, 376 (5th Cir. 1990). The attorneys challenge the evidence on each prong of the test.

## A.

The attorneys first argue that the evidence was insufficient to prove duty, *i.e.* standard of care. They claim that Terry's expert witness on attorney malpractice, Mike Cook, did not sufficiently identify the standard of care for tax specialists (Hunter and Blazier) and trial attorneys (O'Dowd). *See Geiserman v. MacDonald*, 893 F.2d 787, 793 (5th Cir. 1990) ("In most legal malpractice cases, expert testimony is necessary to establish the standard of care since only an attorney can competently testify to whether the defendant comported to the prevailing legal standard.").

We find that Cook's testimony sufficiently identified the standard of care. Cook clearly stated that, to satisfy the standard of care, the attorneys had to act as an ordinarily prudent attorney would in the same or similar circumstances. He also stated that for tax specialists, the standard was higher because tax specialists "have been trained in . . . a fairly complex) ) very complex area . . . [and] our clients come to us believing that because we are tax specialists, we have this higher degree of knowledge that they are seeking." Cook also testified to the specific duties that Hunter, Blazier, and O'Dowd, owed their clients, Terry and Tracy. Specifically, he testified that the attorneys had a duty to carefully analyze the facts of their situation and the relevant state and federal law and make sure that their clients were "fully informed and not misled" about both the facts and the law.

Accordingly, we reject the attorney's argument that Terry presented insufficient evidence to establish the standard of care.

**B.**

Next, the attorneys argue that there was insufficient evidence to prove that they committed malpractice, *i.e.*, that there was insufficient evidence to prove breach of the standard of care. "A lawyer in Texas is held to the standard of care which would be exercised by a reasonably prudent attorney. . . .The standard is an objective exercise of professional judgment, not the subjective belief

-21-

that his acts are in good faith." *Cosgrove*, 774 S.W. 2d at 664-65. The attorneys make several related arguments, which we address in turn.

1.

The attorneys' initial assault on the jury verdict is the claim that because we earlier found that the tax position they advised Terry and Tracy to report was supported by "substantial authority," *see Streber*, 138 F.3d at 223, they satisfied the "reasonably prudent attorney" standard as a matter of law. Because the attorneys misstate the law and our prior opinion on this point, we disagree.

While intuitively it may seem that advising a position supported by "substantial authority" cannot constitute malpractice, our prior opinion dealt with "substantial authority" not in the dictionary definition sense, but rather as a term of art defined by the tax code. As the time it was enforced against Terry and Tracy, 26 U.S.C. § 6661 provided for a 25% penalty for those who "substantially underestimated" their tax liability. *See* 26 U.S.C. § 6661(a) (1989) ("If there is a substantial understatement of income tax for any taxable year, there shall be added to the tax an amount equal to 25 percent of the amount of any underpayment attributable to such understatement."). However, those charged with "substantial underestimation" could claim, as a defense, that there was "substantial authority" for their tax position. *See* 26 U.S.C. 6661(b)(2)(B)(I) (1989).

As made clear by the reasoning in our prior opinion, one can have sufficient "substantial authority" to avoid a "substantial understatement" penalty without necessarily having a solid legal position. The reporting position advised by the attorneys

> turned on one factual issue: when Parker made the gift to his daughters. . . . The
> subsidiary facts relating to this transaction were complex, largely undisputed, and not
> materially affected by the Tax Court's assessment of the sisters' lack of credibility.
> In a recent decision, the Eleventh Circuit explained that where the substantial
> authority issue turns on evidence going both ways, there is substantial authority from

-22-

> a factual standpoint for the taxpayer's position. *Only if there was a record upon which the Government could obtain a reversal under the clearly erroneous standard could it be argued that from an evidentiary standard, there was not substantial authority.*

*Streber*, 138 F.3d at 223 (emphasis added) (citing *Osteen v. Commissioner*, 62 F.3d 356, 359 (11th Cir. 1995)). As described in our prior opinion, from a factual standpoint, taxpayers have "substantial authority" for their reporting position unless the factual evidence to the contrary is so clear that it would not survive the clearly erroneous standard of review.[29] Accordingly, the fact that the position advised by Hunter, from a factual standpoint, was supported by "substantial authority," is hardly dispositive of whether it is a position that a reasonable attorney, let alone a reasonable tax specialist, would insist is correct.

2.

Second, the lawyers argue that their tax advice (to treat the transaction as a 1985 gift on which Parker owed the gift tax) was correct, or, at the very least, not negligent.[30] However, Terry's

---

[29] The definition of "substantial authority" in cases where a taxpayer's position is based on a legal argument, rather than the facts surrounding that argument, appears to differ. *See Westbrook v. Commissioner*, 68 F.3d 868, 882 (5th Cir. 1995) ("Substantial authority exists when the weight of the [legal] authorities supporting the treatment is substantial in relation to the weight of the authorities supporting contrary positions."); *Cramer v. Commissioner*, 64 F.3d 1406, 1415 (9th Cir. 1995) ("Appellants' treatment of the options does not meet this test. They have relied heavily upon ambiguous legislative history from [sic] 1976 Tax Reform Act that was created subsequent to the enactment of 83. The principle [sic] authorities supporting the contrary position include the plain meaning of the statute, and a regulation promulgated by Treasury interpreting the statute.").

[30] Terry argues that the issue of who owed the tax was decided in the Tax Court (and not appealed), and therefore that principles of issue or claim preclusion preclude our revisiting the issue. We disagree. The attorneys were not parties to the Tax Court case, and the issue in the Tax Court case (who owed the tax) is different from the issue in this case (whether the lawyers' conduct was reasonable). Thus, neither preclusion doctrine should apply. *See United States v. Shanbaum*, 10 F.3d 305, 310-11 (5th Cir. 1994) (holding that a necessary component of claim preclusion is "the same claim or cause of action must be involved in both suits" and a key to issue preclusion is that "the issue under consideration in a subsequent action must be identical to the issue litigated in the prior

-23-

malpractice argument is more nuanced than the attorneys characterize it: she bases her argument on

many factors which she posits were not the work of reasonably prudent attorneys, not merely on the

fact that the advice the attorneys gave turned out to be incorrect.[31] We must determine whether to

uphold the jury's determination that the lawyers' overall conduct, particularly their advice that they

would win at trial and that, accordingly, the sisters should not settle in 1993, was not "reasonably

prudent."

Breach of the standard of care must generally be proven by expert testimony, *see Geiserman*,

893 F.2d at 793, and Terry provided it in the form of attorney Mike Cook.[32] Contrary to the

attorneys' arguments, Cook did testify that treating the transaction as a 1980 gift was incorrect as

---

action"). We are persuaded by the attorneys' argument that "barring relitigation of the underlying
case would mean an attorney could never succeed in a malpractice case, since the prior, unappealed
loss would foreclose any defense."

[31]     As the district court held,

Generally, a plaintiff in a malpractice suit has to establish that, absent the malpractice,
he would have prevailed ("a suit within a suit"). However, in the current case, there
is no requirement of establishing a suit within a suit because the alleged
negligence/malpractice is in failing to adequately research the underlying facts and
properly advise the sisters to settle, with damages arising from the failure to settle.

[32]     The attorneys argue that Cook's testimony to the effect that their conduct was below
the standard of care was merely a "conclusory statement" insufficient to prove malpractice.
However, even assuming that Cook's testimony consisted merely of "conclusory statements," it is
sufficient to uphold the jury verdict. The cases cited by the attorneys all stand for the proposition that
"conclusory statements made by an expert witness are insufficient *to support summary judgment*."
*Burrow v. Arce*, 997 S.W. 2d 229, 235 (Tex. 1999) (emphasis added). However, here we review a
jury verdict, and the standard of review differs substantially. The attorneys do not challenge the
admissibility of Cook's expert testimony, as in *First Financial v. U.S.F.&G. Co.*, 96 F.3d 135, 196
(5th Cir. 1996) ("The admissibility of expert testimony is governed by the same rules, whether at trial
or on summary judgment."); rather, they challenge the testimony's sufficiency to support a jury's
finding of breach. For those purposes, "questions regarding the scientific bases of an expert's opinion
affect the weight to be assigned that opinion rather than its admissibility and should be left for the
jury's consideration." *Slaughter v. Southern Talc*, 919 F.2d 304, 306 (5th Cir. 1990).

a matter of law)) while at one point during his testimony he refused to take a position on exactly when the gift was made, at another he testified that this reporting position was "not a position taken by a reasonably prudent attorney." Cook testified that, in his view, their reporting position was so dubious that it might not even satisfy the low "substantial authority" threshold. Cook's most specific and damaging testimony was that, based on all the evidence available to the attorneys, at least by 1993, advising Terry and Tracy not to settle because they had a good chance to win at trial was far too high a risk. As he stated:

> My opinion is that not only was the income tax position not a position taken by a reasonably prudent attorney, . . . but that in addition, the entire risk involved with taking the position, that is the exposure to a huge gift tax, was not properly analyzed. . . . [I]f you win the income tax position and successfully show the Court that the gift was of cash made in 1985, then the Internal Revenue Service simply has a green light to come collect . . . [a] very large gift tax from Terry and Tracy.

In short, Cook's testimony confirmed the plaintiffs' theory that whatever happened at the Tax Court trial was a "lose-lose" scenario: if their position that the gift was made in 1985 was incorrect (as it was proven to be), they would be liable for capital gains taxes and a large amount of interest; if their position was correct, they would be liable for the higher gift tax *via* transferee liability. *See* 26 U.S.C. § 6901 (allowing the IRS to seek gift tax liability from either the donor, Parker, or the donees, Terry and Tracy); *see also Tilton v. Commissioner*, 88 T.C. 590, 594 (T.C. 1987) ("[S]ection 6901(a)(1)(A) authorizes the assessment of transferee liability, at law or in equity, in the same manner as the liability for gift taxes. This provision, however, does not create any separate liability; it merely provides a secondary method for enforcing the existing liability of a transferor."). Accordingly, Cook's testimony is consistent with the plaintiff's theory, the jury verdict, and the district court's entry of judgment: at least by 1993, based on the facts and the law, failing to advise the sisters to

settle because they had a good chance to win at trial was below the standard of care.[33]

The attorneys argue that they adequately informed Terry and Tracy of the risk of transferee liability. However, the testimony at trial and a plethora of documentary evidence belies that claim. For example, in a June 13, 1991 letter from the attorneys to Terry and Tracy, the attorneys noted that in pre-mediation discussions with the IRS,

> The [IRS] hinted broadly that the Service believes your father insolvent. He makes this pitch: Your client may not directly owe the tax, but they have the money and they must pay if their father won't. This stretches the gift tax transferee liability statute beyond recognition.

The attorneys believed, and continuously and erroneously told Terry and Tracy, that if Parker was liable for the gift tax, the IRS would have to pursue him for the money before approaching the sisters and, accordingly, the risk of transferee liability was extremely remote.[34] As described above, this statement about transferee liability is incorrect as a matter of law and, as Cook testified, it represented conduct below the standard of care for general practitioners, let alone tax specialists.

Terry points to Cook's testimony as the critical evidence supporting her claim of malpractice. However, it is not the only evidence that Hunter, Blazier, and O'Dowd performed below the standard

---

[33] O'Dowd argues that Cook's testimony is insufficient to sustain the jury's finding that he performed below the standard of care because Cook did not separately analyze whether O'Dowd (a general practitioner) breached the lower "reasonably prudent attorney" standard of care rather than the higher "reasonably prudent tax attorney" standard applicable to Blazier and Hunter. To the extent separate evaluations were necessary, Cook's testimony, albeit not crystal clear, was that all three attorneys did not even satisfy the lower standard of care, i.e. "reasonably prudent attorney," let alone the tax specialist standard. Accordingly, O'Dowd's challenge is unavailing.

[34] The record reflects that all three defendants))Hunter, Blazier, and O'Dowd))had told Terry that the IRS would have to go after Parker before attacking them for transferee liability, and that the risk of liability was "remote" at best. Further, the record reflects that O'Dowd had not even by the time of this trial learned the law on this topic. As he testified at trial, "If Larry Parker could absolutely pay any of the transferee liability, then that risk goes away."

of care. The record shows that Hunter and Blazier's legal research and factual investigation was grossly inadequate, particularly in light of the fact that Terry and Tracy paid them approximately $300,000 for their work.[35] The fact that O'Dowd was the first (in 1992) to interview Bradish, to request much of the critical documentation, and to determine what state law applied, let alone what that state law was, is telling of the quantity and quality of their work. Further, the record contains evidence that Hunter and his colleagues, at least twice, rejected a settlement opportunity without first consulting with their clients, and once, without Terry and Tracy's consent, demanded a release for themselves and the firm as a condition of settlement. Finally, the record contains evidence that the attorneys' representation of Betty Berwick in her potential suit against Parker to recover some $17 million Parker had hidden during their divorce was adverse to their representation of Terry and Tracy. The jury could have inferred from this that the tax strategy the attorneys advised Terry and Tracy to take was in part influenced by their desire to put "pressure" on Parker in this separate suit, to the sisters' disadvantage. Overall, the record is replete with examples of misconduct engaged in by the attorneys during their representation of Terry and Tracy.

The attorneys contrast Cook's testimony with that of their malpractice expert, Chad Muller, which they claim was more specific and reliable. However, "in case[s] of conflicting expert

---

[35]    We are not persuaded by Blazier and O'Dowd's arguments that they were so minimally involved in the sisters' case that they cannot be implicated in any malpractice. Clearly, both were part of the legal team that continuously and erroneously underestimated the risks involved in a tax strategy, and there was evidence that neither was honest with Terry and Tracy about their chances in the tax trial. To the extent Blazier and O'Dowd's culpability was less than Hunter's, the jury was properly asked to allocate responsibility under Texas's proportionate liability scheme. *See* TEX. CIV. PRAC. & REM. CODE § 33.001; *Duncan v. Cessna Aircraft Co.*, 665 S.W. 2d 414, 425 (Tex. 1984) ("[T]he fundamental and underlying purpose of [our previous decision to adopt comparative negligence] was to promote the equitable allocation of loss among all parties legally responsible in proportion to their fault.") (citation omitted).

-27-

testimony, the jury is entitled to make credibility determinations and believe the witness it considers more trustworthy." *Simpson*, 903 F.3d at 377. We admit that the evidence of malpractice presented by Cook in this case was not insurmountable.[36] However, given our standard of review and the existence of significant evidence of malpractice, we must affirm the jury verdict on this issue. *See id.* ("Although the evidence of [the attorney's] negligence is not overwhelming, we are not persuaded that the jury's conclusion is unreasonable.").

## C.

The attorneys also claim that there was insufficient evidence to prove that their malpractice, if any, was the proximate cause of Terry's injuries. The attorneys maintain that expert testimony was necessary to prove proximate cause, and that none was provided. Terry responds that expert testimony was unnecessary in this case because the issue was "one that lay people would ordinarily be competent to make." *Arce v. Burrow*, 958 S.W. 2d 239, 252 (Tex.App.) ) Houston [14th Dist.] 1997), *rev'd on other grounds* 997 S.W. 2d 229 (Tex. 1999); *see also Delp v. Douglas*, 948 S.W. 2d 483, 495-96 (Tex.App.) ) Fort Worth 1997) ("[Defendants] urge[] us to adopt a rule that would require expert testimony regarding proximate cause in all legal malpractice cases . . . . While we agree that expert testimony on proximate cause may be required to prove some legal malpractice claims, we refuse to hold that it is required to prove all such claims. Instead, we believe that the

---

[36] Hunter, Blazier, and O'Dowd all separately argue that upholding the jury verdict in this case would transform attorneys from advisors to guarantors of results and allow liability for every attorney who does not compel a client to settle when the client subsequently loses at trial. This, however, is an exaggeration. In this case, there was substantial evidence: (1) that the attorneys' position was very likely to lose, (2) that the attorneys repeatedly told their clients that they would win at trial, and (3) that even if the attorneys did win at trial, the result would have been disadvantageous to their clients because of the subsequent transferee liability. Accordingly, these facts are, in many respects, *sui generis*, and this case does not change the well-established standard for malpractice liability.

proper rule is one that would only require expert testimony on proximate cause in cases where determination of that issue is not one that lay people would ordinarily be competent to make."), *rev'd on other grounds* 987 S.W. 2d 879 (Tex. 1999). Terry posits that once liability for negligence and breach of fiduciary were established, "[a]ny rational juror, who could do simple math, could understand that Terry was severely damaged as a direct result of [the attorneys' actions]."

Guided by the decisions of the Texas courts, we agree with Terry. In *Delp*, after an expert testified on negligence, the court held that the plaintiff, "as a lay person, was qualified to testify that the advice he received from [his lawyer] resulted in [his loss of assets] and in his subsequent bankruptcy filing." *Delp*, 948 S.W.2d at 495-96. Here, once Cook's testimony established negligence and breach of fiduciary duties, lay testimony was sufficient to establish causation. Several witnesses testified that Terry thought she owed the tax, and would have paid it at any time, but did not pay based solely on her attorneys' advice.[37] Terry testified that she would have settled, even by paying up to $600,000, at the 1993 mediation, but did not because the attorneys had told her she was going to win the tax trial. Terry also testified, in detail, to the specific financial losses failing to settle caused her. This testimony was sufficient to sustain the proximate cause finding on each type of damages awarded to Terry, which constituted the direct economic loss from the attorneys' misconduct. *See Douglas*, 987 S.W. 2d at 885 ("The foreseeable result of an attorney's negligence . . . typically extends only to economic loss.").

## V.

The attorneys also challenge the jury's finding of liability for actual and additional damages

---

[37]     For example, Steve Davis, Terry's ex-husband, testified that Terry "said that Mr. Hunter was the tax expert and that she was paying him a large sum of money for his opinion on it, for his expertise, and that we should go with what he was saying."

under the Texas Deceptive Trade Practices Act.  The DTPA "protect[s] consumers against false, misleading, and deceptive business practices, unconscionable actions, [and failures to disclose] . . . in the course of any trade."  TEX. BUS. & COM. CODE §§ 17.44, 17.46(a).  To prove a violation of the DTPA, plaintiffs must prove that: (1) they are a consumer, (2) victimized by false, misleading, or deceptive acts, failures to disclose, or an unconscionable course of action, (3) which was a "producing cause" of damages.  *See Doe v. Boys Clubs of Greater Dallas*, 907 S.W.2d 472, 478 (Tex. 1995).  Violations produce liability for "actual damages", and "knowing" violations allow for "additional damages" which could raise the total damage award to as much as three times the amount of actual damages.  *See* TEX. BUS. & COM. CODE § 17.50(b)(1).

## A.

The attorneys first assert that Terry's DTPA claim is merely a claim that they provided bad advice and, therefore, that the claim is not cognizable under the DTPA.  While they are correct that mere claims of attorney negligence may not be cognizable under the DTPA, *see Latham v. Castillo*, 972 S.W. 2d 66, 69 (Tex. 1998); *Greathouse v. McConnell*, 982 S.W.2d 165, 172-73 (Tex. App.)) Houston [1st Dist.] 1998, pet. denied),[38] Terry has alleged that the attorneys affirmatively misrepresented facts and otherwise deceived them.  If Terry produced evidence of specific deceptive

---

[38]    Even if Terry's claims were solely that the attorneys' advice was malpractice, those claims alone might be cognizable under the version of the DTPA in effect for this case.  *Compare Latham*, 972 S.W.2d at 69 (suggesting that claims for bad advice might not be cognizable under the DTPA); *with Sample v. Freeman*, 873 S.W.2d 470, 475 (Tex.App.)) Beaumont 1994, writ denied) ("It is settled law that attorney malpractice is actionable under the DTPA.") (citing *DeBakey v. Staggs*, 612 S.W. 2d 924 (Tex. 1981).  An amended version of the DTPA expressly applies to lawyers and limits the acts under which they can be sued under the DTPA, excluding anything that can "be characterized as advice, judgment, or opinion."  *See* Tex. Bus. & Com. Code 1749(c), (b)(23).  However, as the lower court held (and neither party contests), the sisters filed their suit before the effective date of the amendments and, therefore, the old version of the DTPA applies.  We should make clear that our analysis will not apply in cases brought under the amended DTPA.

-30-

acts, her claim was cognizable under the DTPA as well as under the common law of legal

malpractice. As the Texas Supreme Court has held,

> Recasting the [plaintiffs'] DTPA claim as merely a legal malpractice claim would
> subvert the Legislature's clear purpose in enacting the DTPA) ) to deter deceptive
> business practices. If the [plaintiffs] had only alleged that [their attorney] had
> negligently failed to timely file their claim, their claim would properly be one for legal
> malpractice. However, the [plaintiffs] alleged and presented some evidence that [their
> attorney] affirmatively misrepresented to them that he had filed and was actively
> prosecuting their claim. It is the difference between negligent conduct and deceptive
> conduct. To recast this claim as one for legal malpractice is to ignore this distinction.
> The Legislature enacted the DTPA to curtail this type of deceptive conduct.

*Latham*, 972 S.W.2d at 69. Accordingly, the attorneys' claim that Texas law forbids the fracture of

a legal malpractice cause of action into malpractice and DTPA claims misses the mark;[39] rather, under

*Latham*, in cases such as this, both causes of action can apply.

The attorneys' argue that, even assuming their advice was incorrect, there was no evidence

of "false, misleading, or deceptive acts or an unconscionable course of action" sufficient to constitute

a DTPA violation. They claim that since their advice was purely opinion and they did not lie or

mislead Terry on an issue of material fact, the DTPA does not apply. *See Douglas*, 987 S.W. 2d at

---

[39]     The attorneys rely heavily on *Sledge v. Alsup*, 759 S.W. 2d 1, 2 (Tex.App.) ) El Paso
1988, n.w.h.), where a Texas Appeals Court held that:

> Nothing is to be gained by fracturing a cause of action arising out of bad legal advice
> or improper representation into claims for negligence, breach of contract, fraud or
> some other name. If a lawyer's error or mistake is actionable, it should give rise to
> a cause of action for legal malpractice with one set of issues which inquire if the
> conduct or omission occurred, if that conduct or omission was malpractice and if so,
> subsequent issues on causation and damages. Nothing is to be gained in fracturing
> that cause of action into three or four different claims and sets of special issues.

*Id.* While the general tenor of this passage supports the attorneys' arguments, we note that the
DTPA was not part of the plaintiff's case in *Sledge*, and that given the Texas Supreme Court's clear
language in *Latham*, 972 S.W. 2d at 69, to the extent *Sledge* implicates Terry's claims in this case,
it is no longer good law.

885-86 ("[The DTPA is] intended to protect consumers against misrepresentations of material fact; statements of opinion alone are generally insufficient to rise to the level of actionable misrepresentations under the DTPA."). Terry, however, points to several acts which she claims violate the DTPA: failures to disclose, *see* TEX. BUS. & COM. CODE § 17.46(23), unconscionable conduct, *see id.* at § 17.50(a)(3), and misrepresentations, *see id.* at §§ 17.46(5), (7), (12), (23).

Though this is a close question, we agree with Terry. First, under Texas law, there was sufficient evidence for the jury to find that the attorneys had misrepresented facts in an effort to persuade Terry and Tracy to continue the tax fight as their attorneys' fees accumulated. "Generally, an act is false, misleading, or deceptive if it has the capacity to deceive an ignorant, unthinking, or credulous person." *Doe*, 907 S.W. 2d at 479. The attorneys' statements that any IRS attempts to collect gift tax from Terry *via* transferee liability would "stretch[] the gift tax transferee liability statute beyond recognition" were false and deceptive; in fact, they rose to the level of fraudulent misrepresentations which pushed Terry and Tracy into going to trial rather than settling their suit in 1993.[40] The Texas Supreme Court has previously held similar claims to be cognizable under the DTPA. *See Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W. 2d 812, 817 (Tex. 1997)

---

[40] The attorneys claim that all of their alleged "misrepresentations" are merely opinions and, as such, not cognizable under the DTPA. *See Douglas*, 987 S.W. 2d at 886. In *Douglas*, the Texas Supreme Court held that a law firm's general advice that a settlement agreement would protect the plaintiffs' interests was "too vague under the facts of this case to support DTPA liability." *Id.* ("Without any evidence about which interests [the firm] represented would be protected, a jury would have no standard by which to measure the accuracy of the representation. Accordingly, [plaintiffs'] evidence constitutes, at most, nonactionable opinion."). The case at bar, however, could not be more different. The statement primarily at issue)) that the IRS must approach a donor for gift tax before seeking satisfaction of a tax debt from a donee)) was not a vague, immeasurable opinion but rather a legal, verifiable fact which the attorneys misrepresented. Further, the failure to disclose argument hinges on facts that the attorneys uncovered)) which put doubt into their original assessment of the sisters' case)) and failed to disclose to Terry and Tracy.

(upholding DTPA violation against accounting firm whose incorrect financial analysis persuaded company to acquire an asset which promptly went bankrupt) ("The basis of a [DTPA] misrepresentation claim is that the defendant's false statement induced the plaintiff to assume a risk he would not have taken had the truth been known.").

Second, Terry points to the attorneys' "failures to disclose" the plethora of evidence, both factual and legal, which indicated that their original advice may have been wrong. The record shows that despite compiling evidence indicating that their original advice, at the very least, was dubious, the attorneys never expressed doubt to Terry and Tracy. To the contrary, they stated that the "documents would speak for themselves," and that, if anything, the equities, rather than the law, were against them. The failure to disclose many facts material to the sisters' settlement decision constitutes further grounds for upholding the jury's finding of a DTPA violation. *See Latham*, 972 S.W. 2d at 69 ("It is the difference between negligent conduct and deceptive conduct.").

Finally, as the district court held, there was evidence that the attorneys were "using the sisters in an effort to gain advantage for other clients [i.e. the sisters' mother] in other cases [i.e. a potentially $17 million lawsuit against Parker]." None of the attorneys ever disclosed the potential conflict between the two representations) ) if Betty (and the Hunter firm) were to recover $17 million from Parker, his funds would undoubtedly have been exhausted, making Terry and Tracy's liability for the tax almost certain—to Terry or Tracy, and this failure to disclose an adverse representation is a deceptive act cognizable under the DTPA. Clearly, this was misleading and deceptive conduct that the jury could have inferred influenced the attorneys' decision to advise Terry and Tracy not to settle in continued reliance on their 1985 advice.

Accordingly, we find sufficient evidence of "deceptive acts" cognizable under the DTPA to

uphold the verdict.

**B.**

The attorneys next argue that any violation of the DTPA was not a "producing cause" of Terry's injuries. "A producing cause is a substantial factor which brings about the injury and without which the injury would not have occurred." *Doe*, 972 S.W.2d at 481 (emphasis added); *see also Haynes & Boone v. Bowser Bouldin, Ltd.*, 896 S.W. 2d 179, 181 (Tex. 1994) ("Producing cause is an efficient, exciting, or contributing cause which in the natural sequence, produced injuries or damage complained of, if any."). Plaintiffs need not show forseeability to prove producing cause. *Doe*, 972 S.W. 2d at 481.

The attorneys argue that there was no evidence that the sisters could have settled their tax liability at the mediation, that Terry's damages arise from her failure to "set aside a reserve" to pay her taxes, and that the damages arise from Terry's failure to appeal her t ax liability to the Fifth Circuit. However, as described herein, there was substantial evidence from which the jury could have inferred that the IRS would have settled in 1993 for $1-$1.2 million. Further, there is substantial evidence (especially in the testimony of Mike Cook) that any appeal of the underlying tax liability to the Fifth Circuit would have been fruitless. Accordingly, there is sufficient evidence to uphold the jury's determination that the attorneys' deceptive conduct was a "substantial factor" in causing Terry's injuries.

**C.**

The attorneys argue that if they violated the DTPA, they did not do so "knowingly," and are thus not liable for DTPA additional damages. "Knowing" violations connote "actual awareness," which "means that a person knows that what he is doing is false, deceptive, or unfair. In other words,

-34-

a person must think to himself at some point, 'Yes, I know this is false, deceptive, or unfair to him, but I'm going to do it anyway.'" *St. Paul Surplus Lines Ins. Co., Inc., v. Dal-Worth Tank Co., Inc.*, 974 S.W. 2d 51, 53-54 (Tex. 1998). Direct evidence of "actual awareness" is unnecessary, as it "may be inferred when objective manifestations indicate that a person acted with actual awareness." *Id.*; *see also Etheridge v. Oak Creek Mobile Homes, Inc.*, 989 S.W. 2d 412, 418 (Tex.App.)) Beaumont 1999, no pet. h.) ("Actual awareness may be inferred from the circumstances.").

After a review of the evidence, the district court decided that the defendants knew that their advice was wrong at latest by 1993 (before the mediation and Tax Court trial). Accordingly, the district court ruled that "[b]ased on the evidence, the jury could reasonably have decided that the continuation of the battle was to vindicate, at any cost, Hunter's original advice without regard to the best interests of the sisters and that Defendants' conduct was in knowing violation of the sisters' best interest."

After thoroughly reviewing the record, we do not share the district court's certainty on this issue. While there was some evidence presented that the attorneys)) especially O'Dowd)) uncovered legal and factual evidence which called Hunter's original assessment into doubt, nothing was presented from which the jury could infer that the attorneys were aware of their misstatements of legal fact, let alone that those misstatements would persuade Terry and Tracy not to settle. The district court correctly determined that all that is necessary is that evidence be produced from which the jury could have inferred actual knowledge. *See St. Paul Surplus Lines Ins. Co., Inc.*, 974 S.W. 2d at 54. However, whether the chain of inferences suggested by the district court is supported by the record is a different, and substantially more difficult, question.

As described below, *see supra* at part V.A., because the district court failed to require

separate findings on actual damages for the DTPA violation and the malpractice and breach of fiduciary duty counts, DTPA additional damages are unavailable as a matter of law. Accordingly, we need not decide whether those damages are supported, as a factual matter, by the record.

## VI.

The attorneys also dispute the district court's allowance and calculation of damages. We review legal issues, such as the availability of a specific type of damages, *de novo*. *See Nero v. Industrial Molding Corp.*, 167 F.3d 921, 929 (5th Cir. 1999). Factual issues, such as the computation of damages, are reviewed for clear error. *See Barrett v. United States*, 100 F.3d 35, 38 (5th Cir. 1996).

## A.

The attorneys argue that because the jury charge did not separate the amount of actual damages from the DTPA violations from the other causes of action, DTPA additional damages are not recoverable. *See Commonwealth Mortgage Corp. v. First Nationwide Bank*, 873 F.2d 859, 868 (5th Cir. 1989) (holding that since "[t]he compensatory damage interrogatory did not ask the jury to apportion its damages according to specific theories of liability . . . we cannot determine whether the jury made the findings necessary to support the award of additional damages [and] reverse that portion of the district court's judgment"). Terry responds that (1) any challenge to the jury charge by the attorneys on appeal was waived by the lack of a formal objection at trial, and (2) even if the attorneys have not waived the issue, *Commonwealth Mortgage* is inapposite.

In *Commonwealth Mortgage*, we held that since the trial court failed to separate the amount of actual damages awarded on a DTPA claim from those awarded on other tort claims and a breach of contract claim, the DTPA additional damages were not recoverable because the jury instruction

did "not require the DTPA [additional] damages to be independent of any contract damages." *Id.* at 869. This holding was, at least in part, based on the observation that "[u]nder Texas law, exemplary damages may not be awarded for a breach of contract." *Id.* at 868. More generally, we held that the jury instructions, in failing to separate liability for actual damages for the various torts and the breach of contract claim, incorrectly "implie[d] that the additional damages need only be proportional to the entire award of actual damages . . . , and not specifically to the DTPA award."[41] *Id.* at 869. Therefore since we could not determine "whether the jury made the findings necessary to support the award of additional damages," *id.*, we reversed the district court's award of DTPA additional damages.

The jury charge in this case suffers from many of the same defects present in *Commonwealth Mortgage*. The jury answered "yes" to all three questions on liability, but was only asked to assess the damages generally, not relative to each count. Since the jury was not asked to allocate the actual damages between the three counts, and was only asked to consider "additional damages" for the DTPA count, it is impossible to determine whether the additional damages were calculated correctly. If, for example, the DTPA actual damages were only $100 and the rest of the large sum of actual damages was due to the tort claims, the "additional damages" available under the DTPA would only be $200, far less than the amount awarded by the jury. As a result, as in *Commonwealth Mortgage*, here "we cannot determine whether the jury made the findings necessary to support the award of additional damages." *Id.*

Terry attempts to distinguish *Commonwealth Mortgage* with the argument that, in that case,

---

[41] "Additional damages" awarded under the DTPA can be no more than twice the amount of actual damages resulting from a DTPA violation. *See* TEX. BUS. & COM. CODE ANN. § 17.50(b)(1).

the count other than the DTPA violation was breach of contract, for which additional damages were unavailable. However, in *Hadley v. VAM P.T.S.,* 44 F.3d 372 (5th Cir. 1995), we considered a case where the jury separately found compensatory and punitive damages on a Title VII count, and found punitive damages on an intentional infliction of emotional distress count. We held that since there was no specific finding of an amount of actual damages on the intentional infliction count, and "a finding of actual damages is a prerequisite to receipt of punitive damages," punitive damages for intentional infliction were precluded. *Id.* at 375. In *Hadley*, even though additional damages were available under both causes of action upon which the jury found actual damages, since they were available under a different standard, separate findings of an amount of actual damages were required. *See id.* at 375.

Terry argues that because the standard for the award of DTPA additional damages, i.e. that the violation be committed "knowingly," is substantially higher than the standard for the imposition of punitive damages under either of the common law torts, any error in failing to secure a separate finding of actual damages on the DTPA count was harmless. We disagree. The standard for the imposition of punitive damages in negligence cases)) gross negligence, *see Transportation Ins. Co. v. Moriel*, 879 S.W. 2d 10, 19-23 (Tex. 1994), differs in theory and practice from the "knowingly" standard for the imposition of additional damages under the DTPA. At one time, the Texas Supreme Court had held that "the terms gross negligence, 'knowingly,' 'willful,' and intentional . . . lie on a continuum with gross negligence being the lowest mental state and intentional being the highest." *St. Paul Surplus Lines Ins. Co.*, 974 S.W. 2d at 53 (citing *Luna v. North Star Dodge Sales, Inc.*, 667 S.W. 2d 115, 118 (Tex. 1984)). However, in *St. Paul*, the Texas Supreme Court noted that after this "continuum" was identified in *Luna*, "the standard for recovery of exemplary damages . . . has since

been raised." *Id.*

To commit a "knowing" violation of the DTPA, an individual must decide to take a given course of action with the knowledge that the path is "false, deceptive, or unfair" to another. *See St. Paul Surplus Lines Ins. Co.*, 974 S.W. 2d at 53. By contrast, one is "grossly negligent" when "[s]ubjectively, the defendant [has] actual awareness of the extreme risk created by his or her conduct," and "[o]bjectively, the defendant's conduct [involves] an extreme degree of risk." *Moriel*, 879 S.W. 2d at 22.[42] Accordingly, while it is not altogether clear where the two standards lie on the post-*Moriel* "continuum" in their state of mind element, it is clear that recovery under the respective standards is based on different evidence. Recovery for "gross negligence" is based on the fact that the defendant is actually aware that his or her conduct created an extreme degree of risk that the plaintiff would be seriously injured. Recovery for "knowing" violations of the DTPA is based on the fact that defendant is actually aware that his conduct was "false, deceptive, or unfair." Accordingly, a "knowing" violation of the DTPA does not necessarily connote "gross negligence"; conduct can be "false, deceptive, or unfair" and still not create an "extreme degree of risk of serious injury to the plaintiff."

We thus cannot agree with the district court that it did not need to separate the actual damage award on the DTPA count from the actual damage award for the negligence and breach of fiduciary duty counts. As in *Commonwealth Mortgage* and *Hadley*, we are here unable to evaluate the propriety of the DTPA additional damage award because it is unclear what proportion of the actual

---

[42] "Extreme risk is a function of both the magnitude and the probability of the anticipated injury to the plaintiff.. . . [T]he 'extreme risk' prong is not satisfied by a remote possibility of injury or even a high probability of minor injury, but rather 'the likelihood of serious injury' to the plaintiff." *Moriel*, 879 S.W. 2d at 22 (citation omitted).

damage award was attributable to the DTPA violation rather than the common law torts.[43]

Accordingly, we vacate the district court's award of additional damages to Terry.[44]

**B.**

In calculating actual damages, the jury assessed Hunter individually at fault for 60% of the damages and the firm at fault for 10%. Hunter and the firm dispute the imposition of damages on both entities, characterizing this action as "double counting."

We reject this argument. As a threshold matter, neither Hunter nor the firm ever previously challenged the submission of both entities to the jury as potentially liable parties, and accordingly we review only for plain error. *See Tompkins v. Cyr*, 202 F.3d 770, 784 (5th Cir. 2000) (holding that a double recovery challenge was "essentially [an] objection[] to the jury instructions" and that the failure to object to the instructions on that ground "limits the defendants' ability to appeal on these grounds"). Reviewing for plain error, we find none. Despite the fact that Hunter is the firm's sole shareholder and, under basic corporate law principles, the only one liable for the firm's debts, *see* Robert C. Clark, CORPORATE LAW § 1.2.1 (1986), Hunter and the firm are clearly separate legal

---

[43] Terry's argument that the attorneys waived their *Commonwealth Mortgage* challenge to the jury charge by failing to object on that ground in the district court is unavailing. As we held in *Hadley*, "[t]he defendant has no duty to ensure that the plaintiff has furnished jury questions covering all fact issues necessary to his cause of action. Texas law is clear that a plaintiff must allege, prove and secure jury findings on the existence and amount of actual damages sufficient to support an award of punitive damages." *Hadley*, 44 F. 3d at 375 (citing *Nabours v. Longview Sav. & Loan Ass'n*, 700 S.W. 2d 901, 903 (Tex. 1985)); *see also Commonwealth Mortgage*, 873 F.2d at 869 ("An appellant cannot be held accountable for the failure of an appellee to secure separate jury findings upon which an accurate judgment could be based.").

[44] The attorneys argue that since attorneys' fees are available under the DTPA but not for malpractice claims, if we reverse the finding of DTPA additional damages we must also reverse the granting of attorneys' fees. This is not the case, because even though we here reverse the DTPA additional damages finding, DTPA actual damages still exist.

entities whose involvement in the course of events at issue in this case, and corresponding level of culpability, differ. Accordingly, the district court properly submitted both entities to the jury and allowed the factfinder to decide their respective levels of guilt, if any.

### C.

The attorneys object to the award of $97,500 in actual damages to Terry for the reasonable value of her time spent "attempting to resolve the situation." The record reveals that this element of damages was thrown out by the trial judge during the charge conference, only to mysteriously appear in some copies of the jury charge, including the one read and presented to the jury. During the on-the-record objections to the jury charge, which occurred while the jury was deliberating, the following colloquy occurred:

The Court:    With regard to the damage questions, I think there's one in there that was in one of the earlier drafts. We were going))I think it's the one with regard to the time, trouble and nuisance of them trying to recover the money.

Plaintiffs:    Right.

The Court:    We took that out, and all of a sudden it appeared again in the last draft, the one I read to the jury. I don't know where it came from. My operator-computer doesn't know where it came from. Because we remember specifically, I think, draft three or four don't [sic] have it in it. It appeared in the last one. So that's one that isn't supposed to be there.

Plaintiffs:    I don't believe The Court read that to the jury, did they?

The Court:    I think I did, but if we get something, I'll have to deal with that then. It didn't appear in the other copies and may not appear))

Defendants:    It wasn't in my copy.

Plaintiffs:    It was not in my copy.

The Court:    Where it came from, we don't know what happened in the computer. But that's the one they have. We will just have to))that is an error that I have seen, so it's not supposed to be there.

The jury, which was instructed orally and in writing to consider such damages, awarded Terry and Tracy $97,500 each for the time spent correcting the problems caused by the attorneys. Inexplicably, however, despite the statements above showing its intent to eliminate this element, the district court entered judgment in that amount for each sister.

The attorneys argue that because the jury charge presented to them before closing arguments did not contain this element of potential damages, entering judgment for them violates due process because their lack of notice made them unable to argue the issue in closing arguments.[45] We agree. It is well-settled that litigants have due process rights to fully litigate each issue. *See du Pont v. Southern Nat'l Bank of Houston, Texas*, 771 F.2d 874, 881 (5th Cir. 1985). While that right in civil cases does not necessarily include the right to make a closing argument, *cf. In the Matter of Generes*, 69 F.3d 821, 825 (7th Cir. 1995) ("[Plaintiff has] supplied no authority for the proposition that closing arguments are a constitutional right in civil cases and nor have we been able to find any."), if granted the right to make closing arguments they must be afforded some procedural protections. Having the correct version of the jury instructions in front of them, so as to have an opportunity to comment on each part of those instructions should they so choose, must be protected. *See Jones v. Southern Pacific R.R.,* 962 F.2d 447, 451 (5th Cir. 1992) ("The purpose of [Rule 51] is to permit counsel to argue effectively on the evidence and to know in advance the guiding principles under which closing argument should be made."); Wright and Miller, FEDERAL PRACTICE AND PROCEDURE, Civil 2d §

_____

[45]    Terry's brief on appeal completely neglects to address the attorneys' arguments on this ground.

2552 (Fed. R. Civ. P. 51 "requires the court to inform counsel of its proposed action on the requested instructions before counsel make their arguments to the jury. This is intended to permit counsel to argue intelligently based upon the evidence, within the applicable law as the court will give it to the jury, and it serves the additional purpose of alerting counsel to make appropriate objections following the charge.").

Here, even though the district court told the parties that damages for the "reasonable value of the time spent . . . correcting or attempting to correct the problems caused by the Defendants' conduct" would not be included in the verdict form or the jury charge, and admitted that inclusion was an "error" and that it "wasn't supposed to be there," the court entered damages for $97,500 on this ground. We vacate this particular award.

## D.

The most significant award of actual damages by the jury was in the form of "interest differential," *i.e.* the difference between the interest earned by Terry from the $1.7 million while she had it and the interest charged by the IRS. Terry argues that because she would have paid the tax but for the attorneys' actions, the loss represented by interest differential is a direct consequence of their misconduct. The attorneys argue that such damages are not recoverable as a matter of law.

Our research reveals that this is an issue of first impression in this, or any, court. The parties cite two lines of somewhat analogous cases. First, courts have forbidden recovery of tax interest (all interest paid to the IRS, rather than "interest differential") as part of the "actual damages" available for securities fraud claims under Rule 10b-5.[46] Second, courts are split over whether tax interest is

---

[46] *See DCD Programs, Ltd. v. Leighton*, 90 F.3d 1442, 1449 (9th Cir. 1996) ("The parties' tax liabilities resulted from the ineluctable requirements of the Internal Revenue Code, rather than from any wrongful conduct on the part of defendants."); *Stone v. Kirk*, 8 F.3d 1079, 1092 (6th

recoverable in claims of accountant malpractice.[47] Courts that forbid recovery of tax interest do so

under the rationale that it would be "double recovery": the plaintiff reaped the benefits of having the

money for the requisite period and would also be reimbursed for the interest charged by the IRS for

having the money during that period. By contrast, those courts that allow recovery of tax interest

assert that it is necessary to make the plaintiff whole.

We hold that, in this particular case, "interest differential" is a recoverable form of damages.

First, unlike recovery of all tax interest paid to the IRS, recovery of "interest differential" is not

double recovery. If Terry received full reimbursement of interest paid to the IRS, she would keep

the interest earned on the $1.7 million and not have to pay the IRS for having control over the money

unlawfully. That would, essentially, be double recovery. By contrast, asking for "interest

differential" is not asking to keep the money earned on the $1.7 million while possessing it unlawfully;

rather, it is asking to pay only the interest earned while possessing it unlawfully and not be penalized

for conservative investing.

Second, state law governs the availability of damages, *see Jackson v. Johns-Manville,* 750

F.2d 1314, 1325 (5th Cir. 1985) ("[E]nsuring the availability of compensation for injured plaintiffs is

---

Cir. 1993) ("Neither are the [plaintiffs] entitled to recover the interest they had to pay on their back taxes, at least insofar as the IRS charged a market rate of interest."); *Freschi v. Grand Coal Venture*, 767 F.2d 1041, 1051 (2d Cir. 1985) ("The interest and penalties were not really a damage suffered by . . . [plaintiff], but a return by him of what would otherwise be a windfall resulting from his opportunity to use money to which he was not entitled.").

[47]     *Compare Ronson v. Talesnick*, 33 F. Supp. 2d 347, 352-53 (D.N.J. 1999) (allowing recovery); *Dail v. Adamson*, 570 N.E. 2d 1167, 1169 (Ill. App. Ct. 1991) (same); *Jobe v. Int'l Ins. Co.*, 933 F. Supp. 844, 860 (D. Ariz. 1995) (same), *withdrawn as settled* 1 F. Supp. 2d 1403 (1997) *with Eckert Cold Storage, Inc. v. Behl*, 943 F. Supp. 1230, 1235 (E.D. Cal. 1996) (forbidding recovery); *Alpert v. Shea Gould Climenko & Casey*, 160 A.D. 2d 67,72 (N.Y. App. Div. 1990) (same).

predominately a matter of state concern and, in the absence of congressional enactments, state law, both as to the extent of compensation available and punitive damages, must apply."), and we believe that under the Texas law at issue in this case, interest differential damages are recoverable. First, the DTPA was enacted "to provide plaintiffs a remedy where the common law fails" and "is to be liberally construed and applied." *Latham*, 972 S.W. 2d at 68-69. "Actual damages" recoverable under the DTPA include all "those recoverable at common law," *id.,* and the DTPA envisions compensating plaintiffs for "the total loss sustained as a result of the deceptive trade practice . . . includ[ing] related and reasonably necessary expenses." *Henry S. Miller Co. v. Bynum*, 836 S.W. 2d 160, 162 (Tex. 1992); *see also Douglas*, 987 S.W. 2d at 885 (discussing the "importance of awarding sufficient damages to ensure that the plaintiff is made whole"); *Arthur Andersen*, 945 S.W. 2d at 816 ("The amount of actual damages recoverable is the total loss sustained as a result of the deceptive trade practice.") (citations omitted). A similar result is apparent under Texas legal malpractice law, which is "in keeping with the well-established principle that a plaintiff should receive an amount of damages sufficient to make her whole." *Douglas*, 987 S.W. 2d at 885. Without "interest differential" damages, Terry cannot be made whole; accordingly, under Texas law, they should be available.

The only limitation on consequential damages available under the DTPA and Texas malpractice law is that they be "foreseeable" and proven with "reasonable certainty." *See Arthur Andersen,* 945 S.W. 2d at 816 (asserting that damages must be "directly traceable to the wrongful act and result from it"); *Higbie Roth Construction Co. v. Houston Shell & Concrete*, 1 S.W. 3d 808, 814 (Tex.App.) ) Houston [1ˢᵗ Dist] 1999, ) ("Damages that are too remote, too uncertain, or purely conjectural are not recoverable."). Given that Hunter was well-aware of the sisters' plans to invest conservatively, this was clearly foreseeable. Further, Terry testified that she invested her money

primarily in certificates of deposits, money market accounts, and annuities, with some invested in

mutual funds and bonds. She testified to the exact amount of interest she earned on her investments,

and to the exact amount charged by the IRS. Tom Glass, a certified public accountant, testified that

Terry's investments, which earned approximately 4.5% interest, were those of a reasonably prudent

investor. Reed Mendelson, the sisters' investment advisor (and a defense witness in this case),

testified similarly. All told, the testimony told the jury exactly how much interest Terry had earned

on the $1.7 million and exactly how much interest the IRS charged her for holding on to it. This is

sufficient "reasonable cert ainty" to uphold the damage award under the DTPA and Texas legal

malpractice law.

## VII.

Finally, the attorneys make several arguments concerning the evidence they were allowed to

introduce, and the general conduct of the trial. They assert that because of a multitude of errors, the

district court erred in denying their motion for a new trial.

"Courts do not grant new trials unless it is reasonably clear that prejudicial error has crept into

the record or that substantial justice has not been done, and the burden of showing harmful error rests

on the party seeking the new trial. Ultimately the motion invokes the sound discretion of the trial

court, and appellate review of its ruling is quite limited." *Sibley v. Lemaire*, 184 F.3d 481, 487 (5[th]

Cir. 1999). With this in mind, we review the district court's rulings for abuse of discretion. *See id.*

## A.

The attorneys first complain of the district court's failure to grant a continuance before trial.

Our review of this decision is circumscribed. As we have previously held,

When the question for the trial court is a scheduling decision, such as whether a

-46-

continuance should be granted, the judgment range is exceedingly wide, for, in handling its calendar and determining when matters should be considered, the district court must consider not only the facts of the particular case but also all of the demands on counsel's time and the court's. We will not substitute our judgment concerning the necessity of a continuance for that of the district court unless the complaining party demonstrates that it was prejudiced by the denial.

*HC Gun & Knife Shows, Inc. v. City of Houston*, 201 F.3d 544, 549-50 (5th Cir. 2000).

The attorneys claim that a continuance was warranted for two reasons. First, thirty-nine days before trial, counsel for all of the attorneys in a joint defense, Casey Dobson, was granted leave to withdraw from the case and replaced by new counsel.[48] Dobson withdrew because representation of all of the attorneys in a joint defense involved conflicts of interest. Those conflicts were exposed when, shortly before trial, Terry and Tracy presented a settlement offer to Jamison Dupuy, then also a defendant in the case. The settlement offered to release Dupuy from the case not in exchange for a sum of money, but rather in exchange for his obtaining and presenting to Terry and Tracy's attorneys a defense file which could harm the other attorneys. Once the settlement offer was received, what appeared to be in Dupuy's best interests was contrary to those of the other attorneys.

Despite the fact that the particular problem which sparked Dobson's withdrawal was created by questionable tactics on the part of the sisters' attorneys,[49] we do not agree that a continuance was

---

[48] As Terry notes, the district court did not *sua sponte* order the substitution of counsel in this case; rather, Dobson requested it and, in response, the court granted leave to withdraw.

[49] Given that the duty of confidentiality unquestionably forbade acceptance of this settlement offer, the defense attorney correctly determined that withdrawal from all aspects of this joint representation was his only option. *Cf. Brennan's Inc. v. Brennan's Restaurants, Inc.*, 590 F.2d 169, 172 (5th Cir. 1979) ("The obligation of an attorney not to misuse information acquired in the course of representation serves to vindicate the trust and reliance that clients place in their attorneys."). Further, given that the plaintiffs' attorneys knew that acceptance of the offer would constitute an ethical violation, proposing the offer may have itself violated the ethical rules. *See* Model Rules of Professional Responsibility, Canon 9 ("A lawyer should avoid even the appearance of professional impropriety.").

warranted on these grounds. Given that one attorney was representing a plethora of defendants, whose interests were clearly separable, it should not have been surprising that conflicts of interest arose. *See generally* Ronald E. Mallen & Jeffrey M. Smith, LEGAL MALPRACTICE § 29.9 (4th ed. 1996) ("The litigation attorney is susceptible to those conflicting interests indigenous to the representation of multiple parties. The consequences of such representation can be disqualification, discipline, loss of compensation and malpractice liability."). For example, we agree with Terry that, given that Hunter provided the initial advice in this case, each of the other attorneys could have brought a cross-claim for indemnity or contribution against Hunter. Additionally, given that in accordance with Texas law, *see* TEX. CIV. PRAC. & REM. CODE §§ 33.001, 33.003, damages would be awarded in proportion to percentage of fault, the potential for conflicts of interest in this case was obvious. Given that the conflict of interest exposed here was not unpredictable, and that the time remaining until trial, thirty-nine days, was not extraordinarily brief, the district court did not err in failing to grant a continuance on this ground.[50]

Second, the attorneys argue that a continuance should have been granted to give them additional time to rebut the sisters' interest differential theory. The district court initially granted the attorneys' motion for summary judgment, asserting that interest due to the IRS was not a recoverable form of damages.[51] Shortly thereafter, Terry filed a motion for reconsideration, and Tracy filed a

---

[50] The trial court reasoned that "Trial settings and deadlines have been extended numerous times, making this case one of the oldest on the undersigned's docket. . . . Because of the Court's criminal duties and docket of civil cases, if this case is postponed the first time available for a trial of this length is late fall [five months from now]. Because the Court does not wish to postpone the resolution of this matter any longer, the Motion for Continuance is DENIED."

[51] Following the caselaw mentioned above, the court asserted that "[p]laintiffs have failed to provide any evidence showing that the IRS charged them a higher rate of interest than the rate they should have earned through appropriate investments." (emphasis in original).

motion to reconsider or to clarify. Based on these motions, the district court decided to "allow testimony with regard to the rate of returns with regard to . . . the difference between the rate of return and the interest rate charged by the IRS." The two rulings are not entirely contradictory: the first granted summary judgment on the issue of whether all interest owed the IRS was recoverable, while the second denied summary judgment on whether "interest differential" was recoverable.

The attorneys claim that failing to grant a continuance was error, because (1) once the court granted partial summary judgment on this ground, they allowed their expert witness to go on vacation, and accordingly at trial they were without the testimony of their expert witness, and (2) they had insufficient notice to defend themselves against this particular claim. However, as Terry notes, the attorneys were well aware that both plaintiffs had filed motions for reconsideration which remained pending, and thus the issue remained alive. "A partial summary judgment order . . . is not a final judgment but is merely a pre-trial adjudication that certain issues are established for trial of the case. Such an order is interlocutory in nature, is subject to revision by the district court, and has no *res judicata* effect." *F.D.I.C. v. Massingill*, 24 F.3d 768, 774 (5th Cir. 1994). Furthermore, if the defendants wanted to dispute the interest differential theory, they had nine days between the time the court decided to entertain the theory and the time they began presentation of the defense case to prepare. Accordingly, while the partial reversal of the earlier summary judgment motion made it more difficult for the attorneys to defend themselves, there was no undue prejudice.

**B.**

The attorneys next complain of the district court's exclusion of the Tax Court opinion, specifically its finding that Terry was "not credible," as evidence at the trial. The district court

-49-

excluded the opinion under Federal Rule of Evidence 403,[52] claiming that introduction was minimally

probative and would unduly confuse the jury. We review the district court for abuse of discretion,

and as we have previously held, "Rule 403 determinations will not be disturbed on appeal absent a

showing of clear abuse." *Curtis v. M&S Petroleum*, 174 F.3d 661, 673 (5th Cir. 1999).

The portion of the Tax Court opinion that the attorneys wanted the jury to hear included the

following:

> We did not find the daughters to be credible witnesses. [Terry] did not offer oral
> testimony, but her testimony was offered by deposition and affidavit. She also
> answered interrogatories. There are significant inconsistencies between (1) her
> testimony and her answers to interrogatories and (2) other evidence in this case. *We
> believe that, in various important respects, [Terry] has failed to tell the truth. . . .*
> Accordingly, we have accorded [Terry's] testimony very little weight.. . . Tracy did
> testify orally. In important respects, her testimony was vague and indefinite. She was
> contradicted by other witnesses. We do not have much confidence in her testimony,
> and, accordingly, we give it little weight.

*Streber*, 70 T.C.M. at 1611 (emphasis added). The attorneys argue that they should have been able

to show the jury that the tax court judge found Terry and Tracy incredible, and they assert that

exclusion deprived them of a fair trial.

We disagree. The district court excluded the opinion because it felt the opinion would

confuse and/or mislead the jury. This is undoubtedly true. The tax court found Terry's written

testimony contradictory, and stated that Terry "failed to tell the truth" even though Terry did not

testify at the tax court trial and was absent for the entire proceeding; rather, she was in the midst of

---

[52]      Fed. R. Evid. 403 provides:

Although relevant, evidence may be excluded if its probative value is substantially
outweighed by the danger of unfair prejudice, confusion of the issues, or misleading
the jury, or by considerations of undue delay, waste of time, or needless presentation
of cumulative evidence.

a high-risk twin pregnancy and was told by her doctor to avoid long trips. The district court was understandably wary that the jury would find the tax court to have some particular expertise in judging credibility, and that the opinion would mislead the jury into finding Terry incredible in this case.[53]

Moreover, as the district court noted, we reversed the Tax Court's opinion in part, finding that Terry and Tracy relied on Hunter's advice. *See Streber*, 138 F.3d at 221. Introduction of the Tax Court opinion would have inevitably led to arguments about our partial reversal of the Tax Court, which is legally complicated. The trial judge framed the problem concisely when he stated that "I think there's some real problems in dealing with trying to explain or trying to deal with what the 5th Circuit did with those issues." Admitting the Tax Court opinion would have confused the issues in that

> [I]n attempting to dispute or explain away the evidence thus offered, new issues will arise as to the occurrence of the instances and the similarity of conditions, new witnesses will be needed whose cross examination and impeachment may lead to further issues; and thus the trial will be unduly prolonged.

*Plemer v. Parsons-Gilbane*, 713 F.2d 1127, 1139 n.11 (5th Cir. 1983) (citing 2 Wigmore, EVIDENCE § 443 at 528-29). In reading the Tax Court opinion, it is unclear how its judgment on Terry and Tracy's credibility effected the outcome. Its judgment that the gift was made in 1980 was based almost exclusively on the documents presented and the testimony of Bradish. While unclear from the opinion, it appears that the sisters' credibility affected only the Tax Court's imposition of penalties,

---

[53] The attorneys argue that the tax court opinion was the only evidence by which it could challenge Terry's credibility. This is untrue. If the tax court found inconsistencies with Terry's testimony in her original deposition and her answers to interrogatories, the attorneys were free to question Terry about these inconsistencies when cross-examining her at trial. In fact, to some extent, the attorneys did this. Accordingly, the issues of Terry's credibility were before the jury, which chose to believe her.

which we reversed on appeal. As we there noted, "[t]he subsidiary facts relating to [the land deal] were complex, largely undisputed, and not materially affected by the Tax Court's assessment of the sisters' lack of credibility." *Streber*, 138 F.3d at 223. The district court felt that explaining our partial reversal, which would be necessitated by admitting the Tax Court opinion, would create problems for the jury, reasoning that "I think it creates issues for my trying to explain, for anybody trying to explain what the 5th Circuit court actually did . . . with the laymen that are sitting here [and] going to be dealing with that." This reasoning is plausible, and thus the ruling of the district court was not an abuse of discretion.[54]

We note that, if probative at all, the exclusion of the Tax Court opinion helped the attorneys as much as it hurt them. Despite the fact that the Tax Court judge (who did not hear testimony from Terry) found Terry incredible, the tax opinion shows that if Hunter had done a sufficient investigation into the facts of the case (by, for example, interviewing Bradish and collecting all the documents) and the Texas law of gifts, he would have not advised Terry and Tracy as he did. Reading the Tax Court opinion, one does not get the feeling that the sisters had a very good chance of success; rather, the Tax Court saw this as an easy case in deciding that the attorneys' advice was wrong. Therefore, if

---

[54] The attorneys rely primarily on *Transcraft, Inc. v. Galvin, Stalmack, Kirschner & Clark*, 39 F.3d 812, 818-19 (7th Cir. 1994), where the Seventh Circuit held that a district court abused its discretion in refusing to admit a trial transcript of a trial in a malpractice case which judged the conduct of the attorneys who participated in the trial. The court there held that "use of the transcript of the underlying trial is not only routine in legal malpractice suits; it is also far superior to having the participants in the trial testify to their recollections; and its admissibility for this purpose, that is, for establishing the strength (or weakness) of the plaintiff's case, the case he claims the lawyer botched to his detriment, cannot be questioned." *Id.* However, there is a tremendous difference between admitting the transcript of the underlying trial, which can help the jury to evaluate the attorneys' conduct for themselves, and admitting a judicial opinion resulting from that trial, which is by necessity only a summary of that trial and fraught with legal judgments which the layman might only partially understand. The introduction of the Tax Court opinion, therefore, would have been far more problematic from a "confusion of the issues" standpoint than introduction of a trial transcript.

the jury would have understood the entire Tax Court opinion, as the attorneys posit, admittance would have made liability more, rather than less, likely.

## C.

The attorneys also argue that the district court's allowing Tracy's attorney, Brad Reagan, to describe how his attorneys' fees were calculated to the jury warranted a mistrial. At trial, Reagan called himself as a witness and gave testimony as to how much money his client had paid him, the difference between paying a lawyer hourly or based on a contingent fee agreement, and the qualifications of himself and his staff. He testified as such because "reasonable and necessary" attorneys' fees are available as damages for violations of the DTPA, *see* TEX. BUS. & COM. CODE ANN. § 17.50(d), and, according to Reagan, it was his normal method of "proving up" attorneys' fees under that statute.

The DTPA allows the recovery of "reasonable and necessary" attorneys' fees, *see id.*, and "it is the province of the jury to determine the reasonable value of an attorney's services." *Brown v. Bank of Galveston*, 930 S.W. 2d 140, 145 (Tex.App.) ) Houston [14th Dist.] 1996), *aff'd* 963 S.W. 2d 511 (Tex. 1998); *see also Arthur Anderson*, 945 S.W. 2d at 819 ("[T]he jury must decide the question of attorney's fees specifically in light of the work performed in the very case for which the fee is sought."). Since "[i]n actions under the DTPA, reasonableness of the fee claimed must be established by evidence," *Leggett v. Brinson*, 817 S.W. 2d 154, 157 (Tex.App.) ) El Paso 1991, n.w.h.), Reagan was merely attempting to present the jury with evidence by which they could adequately evaluate the claim for reasonable attorneys' fees.[55]

---

[55] The attorneys claim that Reagan's testimony was a violation of local rules, which provide that "[a]ll motions for an award of attorneys shall be filed and served no later than fourteen (14) days after entry of judgment pursuant to Rule 54 of the Federal Rules of Civil Procedure." W.D.

Eventually, the testimony was cut off, and the parties all agreed to stipulate on attorneys' fees subject to the trial judge's approval. Nonetheless, the attorneys are correct that, while on the stand, Reagan made some inappropriate remarks, including that his firm takes very few malpractice cases and that it screens cases carefully before agreeing to take them. These comments could arguably constitute counsel's personal comments on the merits of the case, and as such could be improper. *See Grizzle v. Travelers Health Network, Inc.*, 14 F.3d 261, 269 (5th Cir. 1994).[56]

However, this does not necessarily lead to the conclusion that the district court should have granted a mistrial; rather we "must consider the jury charge and any corrective measures taken by the trial court." *Id*. While the jury was out of the courtroom, the parties and the judge engaged in a lengthy colloquy. The parties decided to leave attorneys' fees up to the judge, and the judge commented that they would let the jury go for the day, and that he would give them proper instructions the following morning. Neither party objected, and neither party asked for the judge to immediately instruct the jury to disregard the testimony. When the jury returned for the day, the judge told the jury that the parties agreed to have the attorneys' fees issue decided by him at the conclusion of the case, and commented that "I'll give you some instructions with regard to how to handle [the evidence] in your determination of any damages, if any, that you decide as the case goes on and you look at those [jury] questions." The next morning, after a further colloquy, the judge again instructed the jury that "since that particular issue is no longer before the jury for your

TEX. R. CV-7j. However, since under the DTPA the jury is to determine what attorneys' fees are "reasonable," this rule does not apply.

[56] In terms of the fairness of the trial, it is irrelevant that the improper comments were made by Tracy's attorney and that she, and her attorney, have settled and are not part of the appeal. Since the claims were tried together, the attorneys' case against Terry was equally prejudiced, if at all, by the improper comments.

consideration as a fact-finder, you're instructed to disregard the evidence presented and not consider it for any purpose. Is that clear. Any question about that?"

To the extent Reagan's comments were improper, any harm was cured by the judge's instructions to disregard, and by the jury instructions,[57] in which the jury was further instructed that the evidence it was told to disregard "can not be used by you in answering any of the questions propounded to you or for any other purpose." Accordingly, the district court did not err in failing to grant a mistrial.

## VIII.

In sum, while this is a close case, under our limited standard of review we find the evidence sufficient to sustain the jury's verdict on all counts of liability. However, we hold that the district court erred in awarding $97,500 in actual damages to Terry based on the reasonable value of her time in attempting to resolve the situation, and vacate the award of these particular actual damages. Further, we find that the district court erred in awarding DTPA additional damages because, under *Commonwealth Mortgage* and *Hadley*, the district court's failure to separate the actual damages on the DTPA claim from those on the negligence/breach of fiduciary duty claims makes additional damages unavailable. Accordingly, we affirm in part, reverse in part, and remand for the district court with instructions to enter judgment for Terry in the amount of $839,116.00 in actual damages, plus the reasonable attorneys' fees identified by the district court.[58]

---

[57]     In his separate brief, O'Dowd makes several vague challenges to the jury instructions, all of which border on frivolous. We reject O'Dowd's arguments.

[58]     Terry has filed a cross-appeal, asserting that the trial court erred in granting judgment as a matter of law on pre-1993 interest differential damages and by failing to include "negligent misrepresentation" as a cause of action in the jury charge. To the extent that Terry has not waived these claims, we reject her arguments and affirm the district court.

EDITH H. JONES, Circuit Judge, concurring:

I concur in this good opinion, emphasizing only the narrowness of our holding on DTPA liability. First, the statute was significantly amended with respect to attorneys after the events before us occurred; our opinion doesn't bear on the amended law. Second, there was sufficient, if not overwhelming, evidence for the jury to find that actual misrepresentations not amounting to mere statements of legal opinion were made to the plaintiff. Third, I would not rely on the alleged undisclosed conflict of interest between the lawyers' desire to capitalize on the mother's lawsuit against Parker and the presumably less-legally-remunerative attempt by the daughters to make Parker pay their taxes. Not only were the clients fully aware of Parker's financial condition, it also seems evident that mother and daughters were presenting a united front against Parker. There was no conflict of interest from the attorneys' standpoint, rather, a misguided attempt at a pincer strategy.